## No. 16,550.

COOLEY ET AL. *v.* ESKRIDGE.
(241 P. [2d] 851)

Decided January 28, 1952.   Rehearing denied March 3, 1952.

Messrs. STRICKLAND, STRICKLAND & TULL, for plaintiff in error Edna Coal Company.

Mr. WORTH F. SHRIMPTON, for defendant in error.

*En Banc.*

MR. JUSTICE ALTER delivered the opinion of the court.

JIM ESKRIDGE, plaintiff below and defendant in error here, brought an action against Cecil G. Cooley, Lester M. Cooley, Vernon B. Smith and Nils A. Swensen, doing business under the name and style of the Edna Coal Company, a co-partnership; Paul Hunt, doing business under the trade name of Paul Hunt Construction Company, M. S. Ferrel, and Elmer Berglin, plaintiffs in error here and defendants below, to recover a judgment for damages to a tractor and his loss of earnings. Trial to a jury resulted in a verdict in plaintiff's favor in the sum of $8,400, for which judgment was entered against all of the defendants except Paul Hunt, as to whom the action had by stipulation of the parties been dismissed. On defendants' motion for judgment non obstante veredicto and for a new trial, the judgment as to Elmer Berglin

was set aside; the action as to him dismissed, and the motion as to the remaining defendants denied. Herein we will refer to Eskridge as plaintiff or by name; Berglin and Ferrel by name, and the Edna Coal Company as Edna.

Plaintiff alleged that he had contracted with Edna for a caterpillar and bulldozer tractor for use in certain construction work on Edna's property; that one Ferrel was an employee of Hunt, who likewise had a contract with Edna for similar work, and that Berglin was employed as a "dirt contractor" by Edna. Further, that on September 22, 1948, and "while the tractor hereinabove described was being used by the Edna Coal Company as hereinabove set forth, the Defendants M. S. Ferrel and Paul Hunt Construction Company, or the Defendants, Elmer Berglin and Edna Coal Company, or each or all of said Defendants, recklessly or negligently allowed the said tractor to roll down a steep incline," resulting in damages to said tractor in the sum of $6,866.23 and loss of profits in the use of said tractor in the sum of $6,-863.68, for which judgment was prayed.

Edna and Berglin filed separate answers, and, because of the action of the trial court in the dismissal of the action as to Berglin and no cross specifications of points having been filed herein, we are concerned only with the answer of Edna, the only plaintiff in error appearing here.

In Edna's answer it is admitted that Berglin was Edna's employee; it is denied that as such employee Berglin had power or authority to hire or discharge employees for Edna, and, further, that Berglin did not assume or undertake so to do. For a second defense it is alleged that at the time Berglin's equipment was damaged it was being operated by Ferrel for plaintiff's use, with plaintiff's authorization so to do. For a third defense it is alleged that plaintiff, by authorizing Ferrel to operate its equipment, voluntarily assumed the risks of damages incident thereto, and for any damages thus in-

curred Edna is not liable. By stipulation at a pre-trial conference, the action was dismissed as to Paul Hunt doing business under the trade name of Paul Hunt Construction Company.

Further in the order of the pre-trial conference, it was stipulated, inter alia:

"That the accident occurred on the 21st day of September, 1949, at the place specified in the complaint, and on that occasion plaintiff's employee operating the tractor was ill and the defendant, Elmer Berglin, and the defendant, Farrel, were at said time on the premises. Berglin was the general foreman of the defendant Coal Company, and Ferrel was on the premises at the time as an employee of the defendant, Paul Hunt, dismissed from this case. That at Berglin's direction, Ferrel undertook the operation of the tractor, and moved it to an hillside, and at this point Ferrel stopped the tractor and Berglin detached the ripper which had been drawn to that point by the tractor. Ferrel left the tractor for the purpose of assisting Berglin in detaching the control cable running from the tractor to the ripper.

"While Ferrel was off the tractor and while they were detaching the cable or shortly after the cable was detached (there is some uncertainty as to this) the tractor started moving and proceeded down the hill with resulting damage.

"The defendant Coal Company contends that in his activities hereinabove mentioned, and in directing Ferrel to operate the tractor, that he, Berglin, was not defendant's employee, and that he was in fact the employee of or was representing the plaintiff at the time.

"It is stipulated that plaintiff had agreed to pay some part of Berglin's wages, the Coal Company paying the balance.

"Plaintiff contends that this arrangement was made with the Coal Company, and that he was merely paying against wages to Berglin which were the Coal Company's obligation, but agreed to do this so as to enable

Berglin to work longer hours, the tractor and operator thereby being enabled to work the longer hours under Berglin's directions."

At the conclusion of plaintiff's case, defendants interposed a motion to dismiss the action, and at the conclusion of all the evidence defendants interposed a motion for a directed verdict, both thereof being denied. A motion for a new trial or for a judgment non obstante veredicto was presented, with the result hereinbefore noted.

Edna, appearing here as plaintiff in error, specifies three points, with subparagraphs thereunder, upon which alleged error is based, but we think it necessary to consider only one thereof for a determination herein, i. e., "That there was no evidence adduced at the trial showing any facts or relationship upon which the liability of the Defendant Coal Company can be predicated, * * *." Counsel for Eskridge, in his brief, states that "the only major point to be considered by this Court is whether or not there was sufficient evidence from which the jury could have found that Ferrel was the agent of the Coal Company at the time of the accident."

The parties hereto, notwithstanding the order on the pre-trial conference, presented evidence which may be summarized as follows:

Edna was engaged in some new construction work separate and apart from its mining operations and had entered into a contract with plaintiff whereby the latter had agreed to furnish equipment and operators therefor; pay all expenses in connection therewith; and do certain grading and filling in accordance with specifications. Edna had two employees engaged in this new work, one thereof being an engineer whose duty it was to indicate by survey stakes from which points earth should be removed and the points where the same should be deposited. The only duty of the other employee—Berglin —was to see that the earth was removed and deposited in accordance with the engineer's stakes and to keep a

record of the time that plaintiff was actually operating his equipment in excavating and filling. Prior to September 21, 1948, plaintiff, together with Cooley, one of Edna's partners, and Berglin entered into an arrangement whereby Berglin was to put in overtime at plaintiff's expense and assist in servicing and maintaining plaintiff's equipment, this arrangement being for the purpose of enabling Eskridge to work longer hours and thereby complete his contract in order that his equipment might be used on other contracts which Eskridge then had. Edna paid Berglin for working daily from 8 A.M. until 4:30 P.M. six days per week. On the morning of September 21, 1948, the operator of one of plaintiff's caterpillar tractors failed to appear for work, whereupon Berglin attempted, without success, to contact plaintiff or his foreman by telephone for the purpose of receiving authorization to put some other operator on the caterpillar. Berglin did not contact any of the partners interested in Edna, but testified that "the superintendent" came to him and said, "Red, we have got to have an operator." to which Berglin replied, "All right, I will try to help you out." Whether the superintendent was in the employ of Edna or Eskridge or Hunt does not appear. Failing to secure authorization, Berglin requested or ordered Ferrel, an employee of Hunt, to assist him in getting the caterpillar serviced and in condition to operate, and, having done so, requested or ordered Ferrel to drive the caterpillar up a steep incline, stating that his purpose in so doing was that "I thought by getting everything all ready, the minute he [Eskridge] said put somebody on it, or I will have some one for it, would save an hour or an hour and a half service time." When Ferrel had driven the caterpillar to the top of the hill, Berglin following, some of the equipment on it was detached by Berglin, and, as Ferrel got off of the caterpillar, it started down the incline and was wrecked. Berglin stated that he was not authorized by Eskridge or anyone else to operate Eskridge's equipment. However,

he testified that while he had made persistent efforts to secure authorization from plaintiff, without success, nevertheless at the time the arrangement was made for his overtime services Eskridge stated to him, "Red, I got a lot of work for these cats and I got to get them out as quick as I can." "Whatever you see fit—the best thing to do is to keep them going" and that he considered this sufficient authorization to justify his actions in directing Ferrel to operate the caterpillar.

Berglin knew that plaintiff always furnished an operator with his equipment, and neither he, Edna nor Ferrel had any control of its operation unless it was given Berglin at the time of his arrangement for overtime as hereinbefore indicated. Berglin had no authority or control over Ferrel who was an employee of Hunt, and to whom alone Ferrel was answerable. Plaintiff describes Berglin as Edna's "dirt foreman" being the man who directed his operations; Berglin describes himself as a "foreman having charge of all dirt work." Cooley, one of Edna's partners, declined to classify Berglin as a foreman, but testified that his duties were "That of seeing that the grading was performed according to the specifications, and that of keeping time on various equipment that was there." and he further testified that Berglin had never been given authority to fire or hire any employees for Edna.

The burden of proof was on plaintiff to establish by a preponderance of the evidence that Berglin had express or implied authority to employ Ferrel before any liability whatsoever could be attached to Edna as a result of Ferrel's negligence. In the absence of express or implied authority, Berglin could not create the relationship of master and servant between Edna and Ferrel so as to make Edna liable to plaintiff for damages resulting from Ferrel's negligence. If Berglin lacked express or implied authority to employ Ferrel to operate plaintiff's equipment, then it is obvious that Edna, in the absence of ratification, is not liable to plaintiff.

██ ██ We recognize as a general rule of law that a master is liable in an action by a third party for any damages resulting from any act of his servant during the employment if the act is within the scope of the servant's employment. The phrase "scope of employment" used in connection with the master's liability for the acts of a servant is to be determined by what the servant is doing for the master and what he actually does with the knowledge and approval of the master. If an act is performed by a servant within the scope of his employment, as that phrase is properly construed, and damages to another result therefrom, the master is unquestionably liable therefor. However, to impose this same liability upon a master for an act of a servant "while in his employ" would result in a master becoming accountable in damages for every tort committed by the servant so long as his term of employment continues. It should be recognized that there is a marked distinction between an act done by a servant "during his employment" and an act done within the "scope of his employment." The master has the unquestioned right to assign duties to his servant and to limit his authority, and no assumption of duties not so assigned will bring those duties within the scope of employment defined by the master. *It is apparent that when an act is not within the scope of a servant's employment it cannot be within either the express or implied authorization of the master.* In the instant case, there is no evidence whatever that Berglin's acts in connection with plaintiff's caterpillar and in his directions to Ferrel were ratified by Edna for it affirmatively appears that Edna knew nothing thereof until after the caterpillar had been completely wrecked. There is no evidence from which the jury might properly find that Berglin had express authorization from Edna to commit a trespass and an unlawful act in taking possession of Berglin's caterpillar or in his directions to Ferrel, so that we are then led to inquire whether Berglin had implied authority. "Implied authority of an agent

is actual authority evidenced by conduct, that is, the conduct of the principal has been such as to justify the jury in finding that the agent had actual authority to do what he did. This may be proved by evidence of acquiescence with knowledge of the agent's acts, and such knowledge and acquiescence may be shown by evidence of the agent's course of dealing for so long a time that knowledge and acquiescence may be presumed. Knowledge of this course of conduct by one dealing with the agent is irrelevant, but knowledge thereof by the principal is not only relevant but essential and must be proved either directly or indirectly as above." *Moore v. Switzer*, 78 Colo. 63, 239 Pac. 874. The rule announced in *Moore v. Switzer, supra,* is clearly applicable when applied to the relationship of master and servant.

██ Implied authority is such as is *proper, usual and necessary to the exercise of that authority actually granted to the servant or such as is actually necessary to accomplish the task assigned by the master to the servant.* As applied to the factual situation here, Berglin's authority to employ Ferrel, if such existed, must be:

" * * * implied from the nature or extent of the work to be performed, from the circumstances of the particular case, from the general course of conducting the business of the master by the servant, * * *." 57 C.J.S., p. 280, §564 (a).

"Where there is neither express nor implied authority given a servant to employ another to perform or to assist him in the performance of his work, or a subsequent ratification by his employer of such employment, the relation of master and servant between the employer and one so employed by his servant does not exist and he is not liable for the negligent acts of the latter under the doctrine of respondeat superior." 57 C.J.S., p. 282, §564 (b).

" * * * It accords with principle, however, to hold that the employer is not liable for the wrongful act of

an assistant who has been procured by the employee, unless the latter can be said to have been clothed with authority, express or implied, to employ help—that is, unless the employee, in engaging the assistant, acted within the scope of his employment." 35 Am. Jur., p. 969, §540.

" * * * The test of the liability of a master for the tortious acts of his servant, now universally accepted, is whether there was express or implied authority for doing the act relied upon by the plaintiff. In the customary legal phraseology, to make the master responsible for the acts of his servant the act must be done in the scope or course of the servant's employment, that is, under the express or implied authority of the master." 35 Am. Jur., p. 983, §552.

▇ Apropos of the question now being considered, the law with relation to principal and agent is clearly applicable to the relationship of master and servant. Under the title "Agency," 2 C.J.S., p. 1227, §99 (a), we find:

"Implied authority is actual authority circumstantially proved, or evidenced by conduct, * * *. It is authority which the principal intended that the agent should have.

*   *   *

▇ "In no event will the agent be deemed by implication to possess powers that the principal could not himself exercise if he were acting personally."

"In order that an implied or incidental authority may exist, it must appear that the act to be done is proper, necessary, or usual in order to promote the duty or to carry out the purpose expressly delegated to the agent; it is not sufficient that the act of the agent is advantageous to or convenient for his principal, or even effectual in transacting the business in which he is engaged. An authority to do a specific thing does not authorize by implication the doing of other and separate things. * * * Nor can the authority to do an illegal act or an act that is contrary to sound public policy be im-

plied from the authority given to do a lawful act." 2 Am. Jur., p. 71, §87.

We have heretofore referred to the fact that neither Berglin, Ferrel nor Edna had any right, authority or control over plaintiff's equipment, or the actual operation thereof, plaintiff furnishing his own operator and paying all costs and expenses in connection therewith. Plaintiff was paid on an hourly basis for the time actually spent in doing the work contemplated by his contract with Edna. Under such circumstances, any interference therewith by either Berglin, Ferrel or Edna was a trespass and an unlawful act. Under this factual situation, the general law applicable is:

"Under the doctrine of respondeat superior, a master is liable for injury to the person or property of another proximately resulting from the acts of his servant done within the scope of his employment in the master's service. On the other hand, the mere existence of the relation of master and servant is not enough to impose on the master liability for whatever torts the servant may commit. Beyond the scope of his employment, the servant is as much a stranger to the master as any third person, and an act of the servant not done in the execution of the service for which he was engaged cannot be regarded as an act of the master, and no liability attaches to him by reason of such act under the doctrine of respondeat superior. In order to render the master liable for an act of this character, it must have been expressly authorized or subsequently ratified." 57 C.J.S., p. 294, §570 (a).

" * * * The servant's acts do not bind the master, in the absence of express authority, when they are such as the master could not himself lawfully do in furtherance of his business; and authority to do an act which the master could not lawfully do himself will not be implied, unless such an inference is warranted from the nature of the employment itself. * * * " Wood, Law of Master and Servant, p. 547, §285.

"It has been held that a servant can have no implied authority to do that which it could not be lawful, under any circumstances, for either him or his employer to do. Certainly no such authority will be implied from a general authority to do lawful acts of the same generic nature. But where a servant is authorized to do acts which may or may not be lawful, according to circumstances, the master may be liable for such an act, though unlawfully done. And of course where express authority is given to do an unlawful act, there is an implied authority to do all acts necessary to effect the main purpose." Shearman & Redfield on Negligence (3d ed.), p. 78, §61.

The following from the decision of our Court of Appeals in *Sagers v. Nuckolls*, 3 Colo. App. 95, 32 Pac. 187, is applicable here:

"The troublesome question in all the cases is not of *express* but *implied* authority, whether the act done was so far incidental to the service for which he was employed that it may be supposed to have been done *'in the line of his duty and in the furtherance of the master's business.'*

\* \* \*

"A well-settled principle of law lying apparently at the very foundation of this action is, 'That a servant can have no implied authority to do that which it could not be lawful under any circumstances for either him or his employer to do.' [citing authorities]"

\* \* \*

" \* \* \* an important test of the liability of the principal seems to be whether he had the authority to do the act performed by the servant, and if he had not there could be no authority implied from him to the servant, consequently the principal would not be liable for the act of the servant on the ground of an implied authority; and to render a principal liable for the acts of the servant, in a matter that could not lawfully be done by

himself, there can be no implied authority—there must be an express authority."

There is not a scintilla of evidence in the entire record which would warrant the finding that Berglin's and Ferrel's actions respecting plaintiff's equipment were expressly authorized by Edna. In fact it is undisputed that Edna had no knowledge whatever thereof until after the accident. There is no competent evidence in the record to support a finding that Berglin was acting within the scope of his employment when he undertook the matters of which complaint is here made resulting in plaintiff's damages. The things which Berglin undertook to do were not for Edna's benefit but for plaintiff's advantage, and were matters which were exclusively for plaintiff's benefit. They amounted to a wilful trespass and were unlawful; and, as we have said, Edna is not liable therefor in the absence of express authorization. Berglin's actions, with resulting damages, arose by reason of his arrangement with plaintiff for the payment of his overtime wages or as the result of a trespass and an unlawful act. If the former, Edna is not liable therefor; if the latter, it having been done without Edna's express authority and not within the scope of the employment, the same result obtains.

The judgment is reversed.