**GREASE MONKEY INTERNATIONAL, INC. and Grease Monkey Holding Corp., Petitioners,**

**v.**

**Nick MONTOYA and Aver Montoya, Respondents.**

No. 94SC206.

Supreme Court of Colorado, En Banc.

Sept. 25, 1995.

Hopper and Kanouff, P.C., Dennis A. Graham, Gene R. Thornton, Victor M. Morales, Denver, for petitioners.

Teresa A. Zoltanski, Denver, for respondents.

Christopher H. Munch, Denver, for amicus curiae Christopher H. Munch, Professor of Agency and Partnership Law, University of Denver College of Law.

Bader & Villanueva, P.C., Gerald L. Bader, Jr., Jeffrey M. Villanueva, Renee B. Taylor, Denver, for amicus curiae Colorado Trial Lawyers Association.

Kennedy & Christopher, P.C., John R. Mann, Denver, for amicus curiae Colorado Defense Lawyers Association.

Justice ERICKSON delivered the Opinion of the Court.

We granted certiorari to review *Montoya v. Grease Monkey Holding Corp.*, 883 P.2d 486 (Colo.App.1994).[1] Petitioners Grease Monkey International, Inc. and Grease Monkey Holding Corporation (collectively Grease Monkey) appeal the court of appeals decision to affirm the trial court's entry of judgment in favor of respondents Nick and Aver Montoya. The court of appeals held that "[g]iven the circumstances of this case and existing Colorado case law, we adopt Restatement (Second) of Agency § 261 as reflecting Colorado law and conclude that the trial court did not err in applying it here." *Montoya*, 883 P.2d at 488–89. We agree that Restatement (Second) of Agency provides authority for

the resolution of the factual issues in this case, but do not approve of the adoption language in the court of appeals opinion.[2] We affirm.

## I

Grease Monkey Holding Corporation is a Utah corporation, and Grease Monkey International is a wholly-owned subsidiary of Grease Monkey Holding Company. From 1983 through 1991, Arthur Sensenig was Grease Monkey's President, Chief Operating Officer, and Chairman of the Board. During that time, Sensenig ran Grease Monkey and had broad authority to act as general officer and agent for Grease Monkey. Sensenig had authority to raise capital from banks and other lenders. The trial court found that Sensenig "had implied or had apparent authority to raise capital by borrowing or obtaining loans on behalf of Grease Monkey from private citizens like the ... [respondents] in this case." Sensenig did not need Board approval for these loans unless they exceeded $500,000.

Respondents Nick and Aver Montoya were married for over fifty years. Nick Montoya worked for the railroad approximately ten years, and he was sole proprietor of a barber shop for about thirty years. He kept the financial records for his church and household. In 1985, he sold a parcel of land he owned with his two sons for $1.2 million. The trial court found Nick Montoya to be a person of "average investor sophistication." Aver Montoya was a factory worker for approximately seventeen years, and she left financial matters primarily to her husband.

Nick Montoya met Arthur Sensenig in the mid–1960's. Sensenig was a teller at a bank where Mr. Montoya was a customer. During the 1960's and 1970's, Sensenig gave Mr.

---

1. We granted certiorari to review "[w]hether the court of appeals erred in adopting the Restatement (Second) of Agency § 261 [(1958)] as the law in Colorado, in light of this court's decision in *Moses v. Diocese of Colorado*, 863 P.2d 310 (Colo.1993), *cert. denied*, [— U.S. ——], 114 S.Ct. 2153 [128 L.Ed.2d 880] (1994)."

2. Section 261 provides "[a] principal who puts a servant or other agent in a position which enables the agent, while apparently acting within

his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." Restatement (Second) of Agency § 261 (1958). Courts do not have the authority to "adopt" a section of a restatement as the law. A court may apply sections of the restatements as a formulation of the law that is applicable to the issue which is before the court. The adoption of law is solely within the province of the General Assembly.

Montoya investment advice. Mr. Montoya was impressed by Sensenig and his progress at the bank. Sensenig ultimately achieved the position of vice-president before leaving the bank. Mr. Montoya also knew Sensenig through a church connection.

From 1983 through 1991, Sensenig secured payments from respondents under the guise that the payments were investments in Grease Monkey. Sensenig secured the payments by representing that, because Grease Monkey was a new company, it did not have its own account, and that as President and Chairman of the Board, Sensenig used his personal account as the corporate account. In furtherance of his scheme, Sensenig took Mr. Montoya to the Grease Monkey offices and showed him a promotional slide show presentation used by Grease Monkey to solicit franchise business. However, none of the payments were invested in Grease Monkey, and Grease Monkey did not receive any of the funds. Rather, Sensenig used respondents' money for his own personal benefit.

Generally, about a week after writing out an investment check, respondents received a promissory note as evidence of their investment. When Sensenig delivered interest payments to respondents, he brought charts showing the growth and success of Grease Monkey. Mailings to respondents concerning their investments were on Grease Monkey letterhead and calls regarding the investments were made to Sensenig at Grease Monkey. Sensenig gave respondents many Grease Monkey promotional items, such as pens, hats, and sweatshirts.

Respondents filed a complaint against Grease Monkey, as Sensenig's employer, for breach of contract, fraud, misrepresentation, breach of duty of good faith and fair dealing, promissory estoppel, extreme and outrageous conduct, and negligent hiring and supervision.[3] After a trial to the court, respondents prevailed on their fraud and misrepresentation claims, and their other claims for relief were dismissed. The trial court entered judgment against Grease Monkey for the outstanding balance due on the promissory notes. The trial court made the following findings: (1) the respondents reasonably believed they were investing in Grease Monkey; (2) Sensenig's representations to respondents were material, false representations, upon which respondents relied to their detriment; (3) Sensenig was acting within his apparent authority when he made the representations regarding the nature of the investments; and (4) Grease Monkey is liable with regard to the investments.

The trial court concluded that the Restatement (Second) of Agency § 261 established Grease Monkey's liability. According to the trial court, "[s]ection 261 is nothing more than a refinement of the principle of apparent authority, which is well established in Colorado law by other cases." The trial court denied respondents' other claims, including the claim of negligent hiring and supervision.

In *Montoya v. Grease Monkey Holding Corp.*, 883 P.2d 486 (Colo.App.1994), the court of appeals affirmed the trial court's judgment. The court of appeals concluded that "the trial court properly held Grease Monkey liable ... because, Sensenig, as its [P]resident, acting within the scope of his apparent authority as an agent of the corporations, engaged in conduct which was customary for an individual employed in Sensenig's position, and was placed in that position by Grease Monkey." *Id.* at 488. The court of appeals applied section 261 as "reflecting Colorado law...." *Id.* at 488–89.

## II

Grease Monkey contends that the court of appeals erred in the application of section 261 of the Restatement (Second) of Agency in light of footnote twenty-seven in *Moses v. Diocese of Colorado*, 863 P.2d 310 (Colo. 1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2153, 128 L.Ed.2d 880 (1994). We disagree because *Moses* is distinguishable from the present case.

---

**3.** Respondents also asserted claims against Sensenig, his wife Edith Sensenig, and John Holzman, a business associate of Sensenig. Prior to trial, Arthur Sensenig, Edith Sensenig, and John Holzman were dismissed from the litigation under the terms of settlement agreements they executed with the respondents.

Section 261 of the Restatement (Second) of Agency provides that "[a] principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." The application of section 261 is not limited to principals and agents but extends also to masters and servants. *See Beer Mart, Inc. v. Stroh Brewery Co.*, 804 F.2d 409, 412 (7th Cir.1986); *Dark v. United States*, 641 F.2d 805, 807–08 (9th Cir.1981); *L.J. Dreiling Motor Co. v. Peugeot Motors*, 605 F.Supp. 597, 610–11 (D.Colo.1985); *aff'd in part, rev'd in part on other grounds*, 850 F.2d 1373 (10th Cir.1988). Grease Monkey primarily relies upon footnote twenty-seven of *Moses* for its claim that section 261 is precluded from being applied as Colorado law. Footnote twenty-seven states:

> The scope of employment requirement restricts vicarious liability for tortious conduct to actions that "should be considered as one of the normal risks to be borne by the business in which the servant is employed." Restatement (Second) of Agency § 229 cmt. a (1958). Although the commission of an intentional tort may sometimes be within the scope of employment, the agent's intent in committing the tortious act must be to further the employer's business. *See Cooley v. Eskridge*, 125 Colo. 102, 112, 241 P.2d 851, 856 (1952) (stating authority to do an unlawful act will not be implied unless it is warranted from the nature of the employment itself) (citations omitted); *Byrd v. Faber*, 57 Ohio St.3d 56, 565 N.E.2d 584, 587 (1991) (giving the example that a bar owner employing a bouncer may be vicariously liable to a patron if the bouncer injures the patron while removing him from the premises). However, if an employee commits an intentional tort solely for reasons that do not further his employer's business or cannot be considered a natural incident of employment, the employer cannot be vicariously liable. *Cooley*, 125 Colo. at 114, 241 P.2d at 857. The scope of employment limitation on vicarious liability partially distinguishes vicarious liability from the tort of negligent hiring.

*Moses*, 863 P.2d at 329 n. 27. Section 261 articulates a specific situation where liability will attach to the principal under the apparent authority doctrine. Footnote twenty-seven discusses a master's liability for the intentional torts of a servant.

### A

Under most situations, the distinction between an agent and a servant is immaterial. Warren A. Seavey, *Handbook of the Law of Agency* § 3, at 4 (1964). However, principal-agent, master-servant, and employer-independent contractor concepts each refer to distinct legal relationships which may or may not overlap. The issues raised in the present case require that these terms be accurately defined and applied.

Under the principal-agent relationship, "[t]he distinguishing characteristic of the *agent* is that he represents his principal contractually. If properly authorized he makes contracts or other negotiations of a business nature on behalf of his principal and by which his principal is bound." Floyd R. Mechem, *Outlines of the Law of Agency* § 12(A) (4th ed. 1952). Using master-servant principles,

> [a] servant is one who works *physically* for another, subject to the control of that other, who is called the master. The statement that the servant is subject to the control of the master does not mean that the master must stand by constantly and observe and supervise the work; it means merely that the relation presupposes a right on the part of the master to have the work performed in such manner as he directs and a correlative duty on the part of the servant to perform in the manner directed, expressly or by implication, by the master. The servant, as such, has no power to bind the master in contract; ....

*Id.* § 13(B) (emphasis added). Under agency law, "anyone who contracts with or acts for the principal other than as a servant is an independent contractor." Harold Gill Reuschlein & William A. Gregory, *The Law of Agency and Relationship* § 7(E) (2d ed. 1990). Therefore, "there are two kinds of independent contractors—those who are

agents and those who are not." *Id.;* Seavey, *supra,* § 6(B).

Servants and non-servant agents are distinguished for two reasons. Reuschlein & Gregory, *supra,* § 7(F); Seavey, *supra,* § 6(C).

> First, the common-law servant, unlike the non-servant agent, subjects his employer to liability for physical harm resulting from his physical conduct in the scope of employment.... Secondly, the relation between master and servant creates rights and liabilities between parties which are different from those between a principal and a non-servant agent.

Seavey, *supra,* § 6(C); *see also* Reuschlein & Gregory, *supra,* § 7(F). By using the language "servant or other agent," section 261 recognizes the distinction between a servant and a non-servant agent.

■ Under the doctrine of respondeat superior, "a master is liable for the unauthorized torts of his servant if committed while the servant is acting within the scope of his employment." Reuschlein & Gregory, *supra,* § 52, at 104. Because "the master's peculiar liability is based on the physical activities of servants, including their batteries, ... he is liable only if the servant's conduct was in some way caused by an intent to serve his employer's interests and connected with his authorized acts." Seavey, *supra,* § 83(B).

■ A master may also be liable for tortious conduct by a servant, as he would be for the conduct of any agent, whether servant or not. *Id.* Acts that are apparently authorized or committed within an agent's inherent powers or where the agent's position enables him to commit a tort exemplify the situations where a principal may be liable

for the torts of servants and non-servant agents. *See* Seavey, *supra,* § 91. When the servant or agent uses the apparent authority of the relationship with the master or principal, the Restatement (Second) of Agency also holds principals vicariously liable for the physical torts of agents who are not servants, i.e., if the tort was committed within the scope of the agency. *See, e.g.,* Restatement (Second) of Agency §§ 251, 257 cmt. g (1958).[4] Apparent authority liability is not based upon the rules of respondeat superior, and it is not "essential to find that the agent was motivated by an intent to act for his master's purposes." *See* Seavey, *supra,* § 91(C). Actions for misrepresentations and fraud generally fit into the category of torts which do not lie within the scope and principles of respondeat superior. *See generally id.* § 92 (discussing the elements for actions based on an agent's misrepresentations). In many of these situations, the agent's position enables him to perpetrate the fraud, and the agent acted for his own purposes. *See id.* § 92(E). However, "[t]he fact that the agent is acting from purely personal motives is immaterial unless this is known to the other party." *Id.* § 92(F).

■ The application of section 261 to the present case squares with the misrepresentation or fraud analysis of the principal-agent doctrine. Footnote twenty-seven of *Moses* refers to respondeat superior as applied to the master-servant doctrine. *Cooley v. Eskridge,* 125 Colo. 102, 241 P.2d 851 (1952), which is cited in footnote twenty-seven, supports this conclusion. Like *Moses, Cooley* involved the scope of employment analysis of the master-servant doctrine. Respondeat superior and master-servant principles constitute an aspect of agency law distinct from

---

4. Restatement (Second) of Agency § 251 states:
   A principal is subject to liability for physical harm to the person or the tangible things of another caused by the negligence of a servant or a non-servant agent:
   (a) in the performance of an act which the principal is under a duty to have performed with care; and
   (b) in the making of a representation which the agent is authorized or apparently authorized to make or which is within the power of the agent to make for the principal.
   Restatement (Second) of Agency § 257 states:

A principal is subject to liability for loss caused to another by the other's reliance upon a tortious representation of a servant or other agent, if the representation is:
   (a) authorized;
   (b) apparently authorized; or
   (c) within the power of the agent to make for the principal.
Comment g states that "[t]he rule stated in this Section applies to physical harm resulting from the misrepresentation, as well as to economic loss." *Id.* at cmt. g.

fraud based on the apparent authority analysis of section 261.

### B

In *Moses,* a church parishioner with a history of mental illness sought counseling from an assistant priest. *Id.* at 314. While counseling the parishioner, the priest entered into a sexual relationship with her. *Id.* When the relationship ended, the parishioner experienced an aggravation of her mental illness. *Id.* The parishioner commenced a civil action against the priest and the Episcopal Diocese of Colorado. The parishioner amended her complaint to include a bishop, and the claims against the priest were severed from the case. *Id.* at 318. The jury found the bishop and the Diocese breached their fiduciary duties to the parishioner, the Diocese negligently hired and supervised the priest, and the Diocese was vicariously liable for the priest's breach of his fiduciary duty to the parishioner. *Id.* at 314.

We concluded "[t]he evidence was sufficient to support ... [the parishioner's] claims for breach of fiduciary duty, negligent hiring, and supervision." *Id.* However, we determined "[t]he evidence ... was not sufficient to prove that ... [the priest] was acting within the scope of his employment when he ... [entered into a sexual relationship with the parishioner]; therefore, the Diocese is not vicariously liable for ... [the priest's] sexual acts with ... [the parishioner]." *Id.* In *Moses,* we addressed the scope of employment aspect of the master-servant doctrine. We did not discuss an agent's apparent authority to perpetrate fraud. *See Richards v. Attorneys' Title Guar. Fund, Inc.,* 866 F.2d 1570, 1572 (10th Cir.), *cert. denied,* 491 U.S. 906, 109 S.Ct. 3189, 105 L.Ed.2d 697 (1989).

The priest in *Moses* was not a non-servant agent who had the power to bind the principal (the Diocese) contractually. Rather, he was a servant, and the Diocese was his master. The Diocese had the right to control the

priest's physical activities. Because the Diocese controlled the priest's physical activities, *Moses* existed in the realm of the master-servant doctrine, and respondeat superior analysis was appropriate. Applying respondeat superior principles, we concluded that a priest acts outside the scope of employment when he engages in sexual acts with a mentally ill parishioner.

■ In the present case, Grease Monkey did not possess the right to control the physical movements or activities of Sensenig, who was the Chief Operating Officer of Grease Monkey. Sensenig was expected to perform certain tasks for Grease Monkey. Grease Monkey did not monitor Sensenig's physical activities, but was only concerned with the results achieved. *See* Seavey, *supra,* § 84(A) ("[A] servant sells or gives his time, while a non-servant agent is paid primarily for results rather than for the time which it takes to accomplish them."). Sensenig acted as a non-servant agent for Grease Monkey. Unlike the priest in *Moses,* Sensenig committed fraud while acting within his apparent authority. Factually, the present case requires a different analytical framework than *Moses,* and the trial court properly applied section 261 and did not address respondeat superior considerations.

### C

■ Previously, we recognized that a principal may be held liable for an agent's actions if the agent is acting pursuant to apparent authority, regardless of whether the principal has knowledge of the agent's conduct. *See Willey v. Mayer,* 876 P.2d 1260, 1264 (Colo.1994). Section eight of the Restatement (Second) of Agency provides "[a]pparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." [5]

---

5. The common law doctrine of inherent agency power set forth in the Restatement (Second) of Agency § 8A (1958) states:

Inherent agency power is a term used in the restatement of this subject to indicate the power of an agent which is derived not from au-

thority, apparent authority or estoppel, but solely from the agency relation and exists for the protection of persons harmed by or dealing with a servant or other agent.

Generally, "[a] principal is not bound by the false representations of his agent made without his knowledge, consent, or authority...." *Erisman v. McCarty,* 77 Colo. 289, 296, 236 P. 777, 781 (1925), *overruled on other grounds by, Burson v. Adamson,* 87 Colo. 451, 288 P. 623 (1930). However, if an agent acts with apparent authority, a principal may be liable even though the agent acts solely for his own purposes. *See American Society of Mechanical Eng'rs v. Hydrolevel Corp.,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (*ASME* ); *Dyer v. Johnson,* 757 P.2d 178, 180 (Colo.App. 1988). Applying an apparent authority theory, " '[l]iability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.' " *ASME,* 456 U.S. at 566, 102 S.Ct. at 1942 (quoting with approval the Restatement (Second) of Agency § 261 cmt. a (1958)). In both state and federal misrepresentation cases, "[c]ourts have commonly imposed liability based on 'apparent authority' ... particularly when the person making the misrepresentation is an important corporate official." *In re Atlantic Fin. Management, Inc.,* 784 F.2d 29, 32 (1st Cir.1986), *cert. denied,* 481 U.S. 1072, 107 S.Ct. 2469, 95 L.Ed.2d 877 (1987); *see also ASME,* 456 U.S. at 567, 102 S.Ct. at 1943 ("The apparent authority theory has long been the settled rule in the federal system.").

Section 262 of the Restatement (Second) of Agency clarifies the rationale of the apparent authority doctrine. Section 262 provides "[a] person who otherwise would be liable to another for the misrepresentations of one apparently acting for him is not relieved from liability by the fact that the servant or other agent acts entirely for his own purposes, unless the other has notice of this." In *ASME,* the Court stated "[b]ehind the principal's liability under an apparent authority theory, then, is 'business expediency—the desire that third persons should be

*When inherent agency is coupled with actual authority and apparent authority, the foundation*

given reasonable protection in dealing with agents.' " *ASME,* 456 U.S. at 567, 102 S.Ct. at 1943 (quoting the Restatement (Second) of Agency § 262 cmt. a (1958)). The rationale behind section 262 is that "[i]t is ... for the ultimate interest of persons employing agents, as well as for the benefit of the public, that persons dealing with agents should be able to rely upon apparently true statements by agents who are purporting to act and are apparently acting in the interests of the principal." Restatement (Second) of Agency § 262 cmt. a (1958).

We conclude that the apparent authority doctrine of section 261 sets forth the appropriate analytical framework for the present case. Section 261 articulates the proper elements of the apparent authority doctrine without conflicting with existing Colorado case law. *See, e.g., Richards v. Attorneys' Title Guar. Fund, Inc.,* 866 F.2d 1570, 1573 (10th Cir.) ("We believe the Colorado Supreme Court would apply § 261 if placed in the position...."), *cert. denied,* 491 U.S. 906, 109 S.Ct. 3189, 105 L.Ed.2d 697 (1989). Next, we consider whether Grease Monkey should be liable for Sensenig's acts under the apparent authority doctrine. *See* Restatement (Second) of Agency § 262 cmt. a (1958) (Under an apparent authority theory, "[t]he line at which the principal's liability ceases is a matter for judicial judgment.").

### III

Under section 261, a plaintiff must establish that the servant or other agent was put in a position which enabled the agent to commit fraud, the agent acted within his apparent authority, and the agent committed fraud. *See* Restatement (Second) of Agency § 261 (1958). First, the trial court found that Sensenig was the highest authority at Grease Monkey. He had authority to raise up to $500,000 without Board approval, and as general officer and agent for Grease Monkey, he had broad authority to act without corporate restrictions. The findings of the trial court support a conclusion that Grease Monkey put Sensenig in a position

for § 261 is established.

where he could commit fraud if he had a mind to.

Second, the trial court found that Sensenig acted within his apparent authority when he raised capital from individuals such as respondents. A finding of fact as to the existence of apparent authority should not be disturbed on appeal. *See Gilmore v. Constitution Life Ins. Co.*, 502 F.2d 1344, 1350 (10th Cir.1974) ("We regard the trial court's finding of apparent authority to be an ultimate finding of fact that cannot be disturbed by us on review unless it be 'clearly erroneous.' "). We also note that "[u]nder section 261 and the theory of apparent authority ... the agent's conduct is seen through the eyes of the third party." *Leafgreen v. American Family Mut. Ins. Co.*, 393 N.W.2d 275, 280 (S.D.1986).

Third, the trial court found that Sensenig made false representations to respondents. Sensenig made these representations with the awareness they were false and with intent to induce respondents to rely on the representations. The representations were material, and respondents reasonably relied on the representations to their detriment. The trial court found for respondents on their claim of fraud and misrepresentation, and we are unwilling to disturb that finding on review.

Grease Monkey contends that the use of section 261 amounts to strict liability for the principal. However, " 'few doctrines of the law are more firmly established or more in harmony with accepted notions of social policy than that of the liability of the principal without fault of his own.' " *ASME*, 456 U.S. at 568, 102 S.Ct. at 1943 (quoting *Gleason v. Seaboard Air Line Ry.*, 278 U.S. 349, 356, 49 S.Ct. 161, 162–63, 73 L.Ed. 415 (1929)). Our decision recognizes the legal principle that "when one of two innocent persons must suffer from the acts of a third, he must suffer who put it in the power of the wrongdoer to inflict the injury." *Richards*, 866 F.2d at 1572–73; *see also Seavey, supra,*

§ 92(B). This policy motivates organizations to see that their agents abide by the law. *See ASME*, 456 U.S. at 572, 102 S.Ct. at 1945.

Accordingly, we affirm the judgment of the court of appeals.

MULLARKEY, J., concurs in the result and specially concurs.

LOHR and KOURLIS, JJ., join in the concurrence.

Justice MULLARKEY concurring in the result and specially concurring:

I concur in the result reached in the majority opinion but write separately because my analysis differs from that of the majority. The petitioner, Grease Monkey, argues in this case that footnote 27 in our opinion in *Moses v. Diocese of Colorado*, 863 P.2d 310 (Colo.1993), *cert. denied*, — U.S. —, 114 S.Ct. 2153, 128 L.Ed.2d 880 (1994), precludes the court of appeals' application of section 261 of the Restatement (Second) of Agency to hold it liable on the promissory notes issued to Nick and Aver Montoya by Arthur Sensenig. I agree with the majority that section 261 provides the appropriate framework for the present case and that the findings of the trial court support imposing liability on Grease Monkey for Sensenig's misrepresentations and fraud pursuant to section 261. Maj. op. at 475. However, I disagree with the majority that footnote 27 of *Moses* is inapplicable in this case because the priest whose sexual activities were at issue in *Moses* was a servant to whom the master-servant doctrine applies, while Sensenig was a "non-servant agent" to whom the doctrine of apparent authority applies. Maj. op. at 474. It appears to me that the application of apparent authority analysis, as opposed to *respondeat superior* analysis, is triggered by the nature of the tort, not by the relationship of the agent to the principal.[1]

The distinction between a servant and a non-servant agent is important for purposes

---

1. While I do not find the distinction between servant and non-servant agents to be relevant in this case, typically corporate executives are considered "servants" rather than "non-servant agents" for purposes of *respondeat superior* analysis. *See, e.g.,* Restatement (Second) of Agency § 220 cmt. a (1958) ("managers of great corporations are normally superior servants, differing only in the dignity and importance of their positions from those working under them").

of determining the liability of a principal for a physical tort committed by an agent incident to the performance of the agent's duties. *See* Restatement (Second) of Agency, Ch. 7, Title B "Torts of Servants" Introductory Note, §§ 220 cmt. e, 250 (1958) (Restatement). As the majority points out, the relationship of "servant" "presupposes a right on the part of the master to have the [physical] work performed in such manner as he directs and a correlative duty on the part of the servant to perform in the manner directed." Maj. op. at 472 (citation omitted). In circumstances involving negligent physical torts, we consistently have required that the servant be acting with some intent to act for the master's purposes in order to impose liability. *See Cooley v. Eskridge*, 125 Colo. 102, 114, 241 P.2d 851, 856 (1952) (holding employer not liable for damages when employee negligently allowed tractor to roll downhill because employee was not acting for employer's purposes); Restatement § 228 ("Conduct of a servant is within the scope of employment if, but only if . . . it is actuated, at least in part, by a purpose to serve the master . . . .").

The concept of apparent authority, however, applies to determine the liability of a principal when either a servant or non-servant agent has committed a tortious representation. *See* Restatement § 219 ("A master is not subject to liability for the torts of his servants acting outside the scope of employment, unless . . . the servant purported to act or speak on behalf of the principal . . . ."); § 257 ("A principal is subject to liability for loss caused to another by the other's reliance upon a tortious representation of a servant or other agent, if the representation is: (a) authorized; (b) apparently authorized; or (c) within the power of the agent to make for the principal."). As the majority recognizes, "[a]cts that are apparently authorized or committed within an agent's inherent powers or where the agent's position enables him to commit a tort exemplify the situations where a principal may be liable for the torts of servants and non-servant agents." Maj. op. at 473. Where apparent authority has been employed to commit a tort, a principal may be held liable whether or not the servant or non-servant agent intended to further the principal's interests.

The rationale behind this rule is that it "place[s] the risk that an agent may abuse his authority for his own benefit on the principal, rather than on the [innocent third party]." *Willey v. Mayer*, 876 P.2d 1260, 1266 (Colo.1994). Thus, the rule provides an incentive for a principal to select reliable agents. It also recognizes that benefits accrue to a principal by employing an agent and that the principal is in a better position to supervise an agent's conduct than a third party relying on the agent's representations. *Id.* Accordingly, where an agent acts with actual or apparent authority in transacting business with a third party, we have held the principal liable even where the third party acts for his own purposes. *See id.* at 1266 (holding principal liable on promissory note where agent used authority under power of attorney to make promissory note from principal payable to himself and used the note as security to obtain personal loan).

Therefore, I agree with the majority that footnote 27 of *Moses* states master-servant principles that do not apply when determining the liability of a principal for a tortious representation where, as in this case, an agent acts with apparent authority. However, the apparent authority doctrine of section 261 applies to this case because the Montoyas were injured when they relied on Sensenig's purported authority and apparent authority to raise money and to enter into secured transactions on behalf of Grease Monkey, not because Sensenig was a "non-servant agent." The female parishioner who became involved in sexual relations with a male Episcopal priest in *Moses* did not rely on the priest's apparent or purported authority to engage in such acts. Instead, she was injured by the sexual misconduct itself. Therefore, the diocese could not be liable except to the extent that the priest acted with intent to promote the purposes of the diocese. *See Moses*, 863 P.2d at 329–30 n. 27.

For these reasons, I would base the analysis of this case on apparent authority, not on the distinction between agents who are ser-

vants and those who are not. Accordingly, I specially concur.

I am authorized to say that Justice LOHR and Justice KOURLIS join in this special concurrence.