**Debra S. CLEVELAND, as personal representative of the ESTATE of Robert RIFKIN, Plaintiff,**

v.

**MACE SECURITY INTERNATIONAL, INC., a Delaware corporation, and American Stock Transfer & Trust Company, Defendants.**

**No. CIV.A.00–K–1516.**

United States District Court, D. Colorado.

April 12, 2004.

Mark A. Redmiles, Senn, Visciano, Kirschenbaum, PC, Denver, CO, for Plaintiff.

Holly S. Stein, Holland & Hart, LLP, United States District Court, David A. Zisser, Isaacson, Rosenbaum, Woods & Levy, P.C., Denver, CO, C. William Groscup, Holland & Hart, LLP, Greenwood Village, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

### I. *Introduction.*

This action arose after original plaintiff the late Robert Rifkin agreed to purchase 100,000 shares of Mace Security International, Inc. ("Mace") after being approached by Larry Alpert, a business associate, with an "urgent" recommendation to "buy Mace." Unbeknownst to Rifkin, those shares were part of 221,000 Mace shares already represented by a stock certificate issued to Razor's Edge Collections, LLC ("Razor's Edge")—a company owned by Alpert—but for which Alpert's check in

payment had bounced. Alpert's idea for fixing the problem was to secure funds for payment by quickly selling off a portion of the Razor's Edge shares and passing the proceeds on to Mace. As a result, time was of the essence. According to Rifkin, the $3.30 per share stock price at which Alpert represented he could purchase Mace was well below the stock's then-market value. Based on his understanding from Alpert that the shares would be "free-trading," i.e. unrestricted, Rifkin agreed to buy with the intent immediately to resell for a profit. Without further inquiry, and without reviewing a prospectus or any other information regarding the stock, Rifkin wired $330,000 directly to Mace using wiring coordinates provided by Alpert.

In the meantime, Alpert instructed the bank to split his Razor's Edge certificate and issue new ones, including one to Rifkin for 100,000 Mace shares. This certificate ("Certificate 1754") bore a "Restricted Securities" legend on its face and explanatory language on the back stating the holder was subject to a prospectus delivery requirement upon resale (the "Resale Legend"). Having understood his shares would be unrestricted, Rifkin believed the legend to be erroneous. He delivered the certificate to his broker at Merrill Lynch with a request to clear the shares for resale, and the broker sought clearance from Merrill Lynch's Executive and Equity Plan Services department to do so.

According to Rifkin, when a Plan Services representative contacted Mace to have the "Restricted Securities" legend removed or a new certificate issued without any restrictions or legends, he was told the shares were subject to a "lock-up agreement" and could not be resold for a year. This turned out not to be the case, but by the time the matter was cleared up and a new certificate ("Certificate 1795") issued without any restrictive legends, the value of Mace stock had fallen to the point that

Rifkin sustained the losses for which he seeks recovery.

Rifkin filed suit against Mace and its transfer agent, American Stock Transfer & Trust Co. (AST) in July 2000, asserting claims against Mace for (1) negligence (premised on the issuance of a stock certificate with an erroneous restrictive legend); (2) negligent misrepresentation (based on Mace's erroneous representation that the Razor's Edge shares Rifkin purchased were subject to a lock-up agreement); and (3) securities fraud in violation of the Colorado Securities Act, Colo.Rev.Stat. § 11–51–101, et seq. Rifkin also asserted an additional claim against both Mace and AST for violation of § 8–401 of the Delaware (Uniform) Commercial Code, 6 Del. Code Ann. §. 8–401 (alleging unreasonable delay in correctly registering the transfer from Razor's Edge to Rifkin). Rifkin sought to recover his $330,000 purchase price as well as other consequential and punitive damages.

Defendants agree Rifkin's shares were never subject to a "lock-up agreement" and deny its representative attempted to enforce such a restriction against Rifkin. With respect to the "erroneous" inclusion of the Resale Legend on Certificate 1754, Defendants deny both that it was erroneous or that it prevented Rifkin from selling his shares in any event. The Resale Legend did not restrict the sale of Rifkin's shares; it merely required that any transfer or sale be accompanied by a prospectus. Defendants also assert any "unreasonable" delay in the issuance of Certificate 1795 was the result of Rifkin's own actions in accepting Certificate 1754 with the legend and then failing to follow the procedure provided under the UCC to have it removed. Once Rifkin did what he was required to do under the UCC, Mace contends it acted promptly and reasonably to remove the legend.

I note here that Mr. Rifkin passed away during the pendency of these proceedings, and his claims are being pursued on behalf of his estate.

The matter is before me on Defendants' Motion for Summary Judgment. Defendants argue Rifkin's evidence is insufficient to create any genuine dispute regarding their version of the facts such that they are entitled to judgment as a matter of law. Jurisdiction over the action exists under 28 U.S.C. § 1332. I grant Defendants' Motion in part and deny it in part.

## II.  *Facts.*

The facts for purposes of summary judgment are as follows:

Mace Security International was incorporated in Delaware on September 1, 1993 and before July 1999, its main business was the production and sale of consumer safety and security products. On July 1, 1999, Mace merged with American Wash Services, Inc., a company engaged in the business of acquiring and operating car wash facilities. The merged company's principal place of business is in New Jersey.

In order to develop its car wash business and deal with short-term indebtedness, Mace set out in late 1999 to raise additional capital by issuing additional shares of its common stock. On December 23, 1999, Mace filed a Form S–3 Registration Statement with the Securities and Exchange Commission, registering for sale 16,645,012 shares of Mace common stock by or for the account of certain identified Mace shareholders, including Razor's Edge. On December 29, 1999, Mace issued Certificate No. 1616 to Razor's Edge for 220,000 of the 221,000 shares originally purchased by Alpert. Alpert's check in payment for the 221,000 shares was dated the following day.

Alpert's check was returned by the bank and as a result, Mace was in a position as of January 6, 2000 of having issued a certificate for 220,000 shares of its stock without having received payment. Under pressure, Alpert began contacting his own business associates to urge them to purchase portions of his Mace shares. One of those associates was Rifkin.

At Alpert's urging, Rifkin agreed to purchase 100,000 shares of Mace. Rifkin's only source of information regarding the purchase was Alpert; he had no communications with Mace regarding the deal. With the understanding that the shares were "fully registered" and "freely tradeable," Rifkin wired $330,000 directly to Mace. According to Rifkin, Mace Chief Financial Officer and Treasurer Gregory Krzemien provided Alpert with the wiring coordinates, and Alpert provided them to Rifkin.

Rifkin neither received nor reviewed a copy of the Mace prospectus before purchasing his 100,000 shares, relying solely on the representations of Alpert. At that time, however, any sale of certificated Mace shares by registered stockholders like Razor's Edge was subject to a prospectus delivery requirement. Alpert was—or should have been—aware of this requirement, in that it was unequivocally set forth in a Memorandum to "Registered Shareholder" dated December 28, 1999.[1] At the time, Mace's final prospectus ("Pro-

---

1. In a December 28, 1999, Memorandum to all Registered Stockholders (including Razor's Edge), Mace General Counsel Robert Kramer informed shareholder (1) that the SEC had declared Mace's December 1999 S–3 Registration Statement effective; (2) that shareholders were therefore authorized to begin the sale of "shares you requested that the Company register on your behalf"; and (3) that "in order for you to sell [your] Shares, a current final prospectus must be made available to the purchaser." Because Alpert had not yet paid for the shares Rifkin was purchasing, Alpert apparently saw his way around this requirement.

spectus") set forth three relevant pieces of information: (1) it disclosed on page one that the securities being issued "involve a high degree of risk"; (2) because registered stockholders and their transferees may be deemed "underwriters" under the Securities Act, "they are subject to the Act's prospectus delivery requirements"; and (3) it listed the names of each of the registered stockholders, disclosing that several, identified with a "plus" (+) after their names, had entered into an additional "lock-up" agreement with Mace which restricted them from selling any of their shares for one year. It is undisputed that Razor's Edge had no "plus" after its name and that Larry Alpert had never signed a lock-up agreement on behalf of Razor's Edge. It is also clear that the individuals at Mace who negotiated the private placement with Alpert had done so with the understanding that Alpert *had* agreed to the lock-up, but managed to close the deal without ever signing the necessary papers.

In any event, after the transaction with Rifkin Alpert issued written instructions for Kramer to have his Razor's Edge shares split and new certificates issued for those shares. Pursuant to those instructions, AST split Certificate No. 1616 and issued Certificate 1754 to Rifkin on March 17, 2000. Certificate 1754 bore a legend stating that the underlying securities had been registered, but that the holder had a prospectus delivery requirement when reselling the shares. Rifkin believed any restriction, including the prospectus delivery requirement, was erroneous and contrary to his agreement with Alpert and delivered the certificate to his Merrill Lynch broker to take care of the problem. That broker, Wayne Barber, contacted Mace Director of Investor Relations Eduardo Nieves. The substance of the conversations that ensued between Nieves, Barber and Kramer is disputed, but Barber's testimony is that Nieves unequivocally represented the shares were subject to

the lock-up provision and told Rifkin he could not sell them for a year, and Mace denies it. Nieves has no recollection of making this representation, and Kramer contends he was in on all of these conversations and specifically told Nieves the shares were *not* subject to lock-up because Alpert had not signed the agreement.

Whatever the case, Barber came away with the understanding that the shares were subject to lock-up and Rifkin, upon learning he could not sell his shares, retained counsel. At some point in early April 2000 Rifkin's counsel presented the certificate to Mace along with a transfer demand asking to have the restrictive legend removed. Mace issued the new certificate to Rifkin bearing no legends on April 24. By the time Rifkin received the certificate on May 1, Mace's share price had fallen to a point such that Rifkin no longer could sell his shares without significant loss.

### III. *Standard of Review.*

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c); *Mincin v. Vail Holdings, Inc.,* 308 F.3d 1105, 1108 (10th Cir.2002). A fact is material if under substantive law it could have an effect on the outcome of the lawsuit. *EEOC v. Horizon/CMS Healthcare Corp.,* 220 F.3d 1184, 1190 (10th Cir.2000). An issue is genuine if a rational juror could find in favor of the nonmoving party on the evidence presented. *Id.* In conducting such a review, I must construe all facts and make reasonable inferences in the light most favorable to the nonmoving party. *Mauldin v. WorldCom, Inc.,* 263 F.3d 1205, 1211 (10th Cir.2001). The initial burden rests with

the moving party to demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Upon such a showing, the burden then shifts to the nonmoving party to show that there is a genuine issue for trial. *Bacchus Indus., Inc. v. Arvin Indus. Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not, however, rely solely on its pleadings but must set forth specific facts showing that there is a genuine issue for trial with regard to those dispositive matters for which it carries the burden of proof. *Mincin,* 308 F.3d at 1108.

### IV. Merits.

■ While I find none of Rifkin's causes of action particularly strong on the merits (and indeed, one is left with the distinct sense that Rifkin's dispute is overwhelmingly with Alpert, and that Mace and AST are minor players in comparison), factual disputes preclude entry of summary judgment on at least those claims for negligence, negligent misrepresentation and unreasonable delay under the UCC. Specifically, there is sufficient evidence to support Rifkin's contention that the Resale Legend should not have been applicable to Certificate 1754 in the first instance and that Mace, through its implied knowledge and participation in the transaction with Alpert, is not entitled to a determination that it did not owe Rifkin a duty as a matter of law. Mace's point that Rifkin himself was the proximate cause of any damage he suffered as a result is well taken, and Rifkin would appear to be vulnerable to such a finding at trial. The disputed evidence regarding Nieves' representations regarding the existence of a "lock-up" restriction on the stock also precludes entry of summary judgment on the negligent misrepresentation claim, although again, there is plenty of evidence from which a jury could infer Rifkin neither relied on that misrepresentation nor was he damaged by it.

With respect to the negligent misrepresentation claim, I reject Mace's contention that Rifkin's redefinition of this claim to focus on Nieves's statements regarding the lock-up agreement rather than the erroneousness of the Resale Legend renders the claim untimely or improper. I also specifically conclude that Nieves's alleged statements regarding the one-year resale restriction were communicated for use in transactions with third parties.

As for the UCC claim, Rifkin again will have a difficult task in convincing the jury AST or Mace acted unreasonably or with unreasonable delay in clearing up the restrictive legend problem. The question is, however, ultimately one for a jury.

By emphasizing the weakness in Rifkin's claims I do not intend to give the impression that the defenses of Mace and AST are strong or that they face no risks in proceeding to trial. The transactions between Mace and Alpert, Alpert and Rifkin, and Rifkin with Mace raise serious questions of Mace's motivation and diligence in the handling of its stock placement initially and in its handling of the errors that followed. The facts illuminated in discovery indicate Mace issued a certificate for 220,000 shares of its registered common stock before the purchaser of those shares even wrote a check in payment. When the check bounced, there is at least the appearance that Mace worked with Alpert to shore up the deal fast and with a blind eye to the necessary disclosures and prospectus delivery requirements that should have occurred.

Then there is the confusion regarding the alienability of Rifkin's shares and the issuance and reissuance of stock certificates to him. The facts are sufficient to support an inference that Rifkin purchased his shares from Razor's Edge, not Mace (and vice versa, I might add) and that Rifkin was therefore not an underwriter

whose shares on resale would be subject to a prospectus delivery requirement. The facts are certainly sufficient to support an inference that Mace representatives were negligent in their representations regarding the lock-up agreement and created considerable unnecessary confusion to the detriment of Rifkin. That all of this could have been avoided had Mace held Alpert to his paces at the outset seems apparent. In the end, neither side may fare well in front of a jury.

■ The only claim that does not survive summary judgment is Rifkin's claim for securities fraud. Leaving aside the factual and legal impediments to establishing that Mace—not Alpert—solicited and "sold" Rifkin his shares as would trigger the application of Colorado's securities fraud statute in the first instance, the facts alleged are insufficient to withstand even a Rule 9(b) motion to dismiss. The only "fraudulent" acts alleged involve the representation that Rifkin's 100,000 shares were subject to a lock-up agreement when they were not. Compl. ¶ 39–41.[2] This "fraud"

had nothing to do with Rifkin's decision to purchase the Mace shares and therefore no nexus with any "sale" under the securities laws. The suggestion buried in Rifkin's briefing that Alpert may have been acting as Mace's agent in soliciting Rifkin in January 2000 fails for a lack of any evidence to support an inference of such an agency relationship. The concept of apparent authority requires that the principal (Mace) take affirmative steps to clothe an agent with indicia of authority such that, from the point of view of a third party, the transaction appears to be with the principal or at its behest. *See Grease Monkey Int'l, Inc. v. Montoya*, 904 P.2d 468, 475 (Colo.1995). Rifkin alleges no facts, and has come forth with no evidence, to support the existence or creation of an actual or apparent agency relationship between Mace and Alpert to sell him Mace stock.

For the foregoing reasons, I DENY Defendants' Motions for Summary Judgment on Rifkin's Claims I, II and IV. I GRANT

---

**2.** Specifically, Rifkin alleges that "[i]n connection with [his] purchase of Mace securities ... Mace employed a device, scheme, or artifice to defraud Rifkin." Compl. ¶ 39. In support, Rifkin avers generally that "Mace made to Rifkin and to certain third parties untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading as described in the General Allegations section above, including specifically ¶¶ 21, 22, and 23." *Id.* ¶ 40. The General Allegations, however, involve actions that postdate by months Rifkin's alleged purchase date and include nothing, other than Nieves' March 2000 statements regarding the lock-up agreement, having anything to do with purportedly fraudulent representations or omissions made by anyone (other that Alpert, perhaps) in connection with the January 2000 sale. The specific paragraphs 21–23 have nothing to do with representations or omissions of any kind of the part of Mace. Para-

graph 21, for example, alleges only that on April 10, 2000, an attorney for Rifkin sent AST a letter enclosing Certificate No. 1795 (meaning 1754) "and demanded that American immediately remove the erroneous legend on Rifkin's shares and that a new stock certificate be issued without any legends of any kind." Paragraph 22 alleges that "on or about May 1, 2000, Rifkin received a new stock certificate, Certificate No. 1795, which .... does not contain any restrictions or legends on the face or back of the certificate." Paragraph 23 alleges that between the date Rifkin received Certificate 1754 and May 1 2000 when he received Certificate 1795, the price of Mace fluctuated between $5.34 per share to $2.75. These allegations simply do not support a claim of fraud in connection with the January 2000 "sale" of Mace securities to Rifkin and provide Mace with no notice what it, or any of its representatives, purportedly misrepresented or omitted in connection with that sale.

the Motions as to Claim III for violation of the Colorado Securities Act.