**CITYWIDE BANKS, Plaintiff–Appellant,**

**v.**

**Brenda L. ARMIJO, Defendant–Appellee.**

**No. 10CA1458.**

Colorado Court of Appeals,
Div. VI.

Oct. 13, 2011.

Podoll & Podoll, P.C., Richard B. Podoll, Robert C. Podoll, Robert A. Kitsmiller, Greenwood Village, Colorado, for Plaintiff–Appellant.

Sweetbaum, Levin & Sands, P.C., Alan D. Sweetbaum, Jonathon G. Nash, Denver, Colorado, for Defendant–Appellee.

Hogan Lovells U.S. LLP, Craig A. Umbaugh, David A. DeMarco, Denver, Colorado, for Amicus Curiae Colorado Bankers Association.

Karsh Fulton Gabler Joseph PC, Seymour Joseph, Denver, Colorado, for Amicus Curiae Land Title Association of Colorado.

Opinion by Judge TERRY.

In this appeal, we address as a matter of first impression the applicability of Colorado's Uniform Commercial Code (UCC) section 4–3–301, C.R.S.2011, to a factual scenario that has not been discussed in Colorado appellate case law since the 1930s.

Plaintiff, Citywide Banks (Bank), appeals the order denying its motion for sale of the property owned by defendant, Brenda L. Armijo. We affirm.

## I. Background

In 2003, Dakota Lending, LLC (Dakota) executed a promissory note to Bank in exchange for a revolving line of credit that allowed Dakota to borrow up to $4 million. Dakota used this line of credit to finance its business of buying, selling, and holding real estate mortgages. As security for Dakota's revolving line of credit, Bank took assignments of the promissory notes and deeds of trust that Dakota financed or acquired in its course of business.

In 2007, Kimberly Poladsky and RE Services, LLC (collectively, RE Services) executed a promissory note (Note) payable to Jaguar Mortgage Company. The Note was secured by a deed of trust that encumbered the property at issue here. After a series of transfers Dakota acquired the Note. Dakota then assigned all of its rights and interest in the Note and accompanying deed of trust to Bank. While Bank held the Note, it allowed Dakota to service the loan and to retain for itself periodic payments made on the Note.

In 2008, RE Services sold the property to Armijo. Title insurance was purchased from Stewart Title, which conducted the closing of the transaction. Stewart Title obtained a payoff statement from Dakota. At closing, Armijo tendered the purchase price, and Stewart Title accepted those funds as closing agent. Stewart Title did not demand production of the Note at closing, and did not attempt to determine the identity of the Note holder. Bank alleges that Stewart Title also failed to obtain a release of the deed of trust at closing. Stewart Title issued a check payable to Dakota for the amount listed on the payoff statement. However, Dakota never tendered the payoff funds to Bank. Dakota is now defunct and its managers are under criminal indictment. Bank, which still holds the Note, has declared the Note to be in default.

Bank brought this action against Armijo to foreclose its lien on the property based on the unpaid Note balance. After a bench trial, the trial court, in a detailed and well-reasoned order, determined that Dakota was Bank's agent and had authority to receive the payoff of the Note. It therefore concluded that Bank was not entitled to foreclose on the property.

## II. Standard of Review

Because this case was tried to the court, our review of the trial court's findings of fact is highly deferential. "Sufficiency of the evidence and inferences and conclusions drawn therefrom must be viewed in the light most favorable to the prevailing party in the trial proceedings." *Gorsich v. Double B Trading Co.*, 893 P.2d 1357, 1361 (Colo.App.1994). "We defer to the court's credibility determinations and will disturb its findings of fact only if they are clearly erroneous and not supported by the record." *Lawry v. Palm*, 192 P.3d 550, 558 (Colo.App.2008). "When the evidence is conflicting, a reviewing court may not substitute its conclusions for those of the trial court merely because there may be credible evidence supporting a different result." *Id.*

However, we review de novo the trial court's application of the governing legal standards. *Id.*

## III. Uniform Commercial Code

Bank first argues that Colorado's UCC establishes that Bank's lien remains enforceable against the property because any payoff of the lien made to Dakota, rather than

directly to the holder of the Note, was ineffective. We are not persuaded.

We pause to mention that the trial court found, and Bank does not dispute, that at the time of the payoff of the Note, Bank was not the valid holder of the Note. Nevertheless, Bank contends that the payoff was ineffective to impair its security interest in the Note, because a valid payoff could only be made to the Note holder upon presentment of the Note, and that did not happen at the closing of Armijo's loan. Bank also points out that, by the time of trial, it had become the valid holder of the Note. We thus proceed to consider Bank's contention that UCC section 4-3-301 required payment to be made to the Note holder rather than to Dakota.

According to Bank, section 4-3-301 codifies the common law "payment rule," and thus requires that, to be effective, payoff of a promissory note must be made to a holder. This argument, however, reflects an unduly narrow reading of the statute.

Section 4-3-301 merely defines a "person entitled to enforce" an instrument, and includes within that definition the holder of an instrument. The statute contains no explicit requirement that payment be made only to the holder of an instrument.

Section 4-1-103, C.R.S.2011, provides that the common law, including the law of agency, supplements the statutory provisions of the UCC. *Id.* § 4-1-103(b), C.R.S.2011 ("Unless displaced by the particular provisions of this title, the principles of law and equity, including . . . the law relative to . . . principal and agent . . . shall supplement its provisions.").

■ Under Colorado's common law, payment to a holder's authorized agent is equivalent to payment to the holder. *Burck v. Hubbard,* 104 Colo. 83, 89-90, 88 P.2d 955, 958 (1939). In *Burck,* the supreme court reasoned:

"When payment is made to the payee after transfer of a promissory note, and the maker does not exact delivery of the note itself, the maker's liability, according to the general rule, still continues. To that rule, however, there are several well-known exceptions. One of these is that, even though the note is not surrendered at the time of payment, the payment is effectual as a discharge if the one to whom payment is made has been given either express or implied authority to receive it; in other words, if under the law he is the agent of the holder for that purpose." *Stock Yards [Nat'l] Bank v. Neugebauer,* 97 Colo. 246, 48 P.2d 813 [ (1935) ].

. . . .

. . . [I]t was recently held, "Where the holder of a note, by his acts and conduct in the light of all the facts and circumstances of the case leads the maker to believe one has authority to receive payment of the note or part thereof, and payment is made to such person in good faith under the belief that he has authority to receive such payment, the holder is estopped from denying such authority." *DeWolf v. Church,* 180 Okl. 66, 69, 67 P.2d 930, 934 [ (1937) ].

104 Colo. at 89-91, 88 P.2d at 958.

■ When section 4-3-301 is read together with Colorado common law, it is clear that payment to an authorized agent has the same legal effect as payment to the holder.

Moreover, section 4-1-103(a)(1)-(2), C.R.S. 2011, provides, as relevant here:

This title shall be liberally construed and applied to promote its underlying purposes and policies, which are:

(1) To simplify, clarify, and modernize the law governing commercial transactions; [and]

(2) To permit the continued expansion of commercial practices through custom, usage, and agreement of the parties. . . .

At trial, the parties presented evidence of current commercial practices and customs in Colorado real estate closings. That evidence contradicted Bank's argument that payoff is not effective if made at closing unless the original note is presented, at least in the context of notes payable to commercial lenders.

Bank's expert witness testified that Colorado's title regulations and standards contain no provision that would require presentment of the original note at a closing where the note is paid off.

Armijo's expert witness testified to the effect that, in Colorado, presentment of the original note at closing was not commonly required for payoff, at least with respect to notes held by commercial lenders. He testified that, despite his having been involved in thousands of closings, he had almost never been presented with the original note, unless the lender was a private lender. He testified that promissory notes are now bundled, they may be sold to off-shore investors, and they may not even be locatable. He said it is difficult to get investors to find the original notes and, if they are located, to get the notes presented at closing, because most investors will not part with original notes.

This evidence of custom and practice was bolstered by the following testimony of an officer of Bank:

Q: [I]s it your position . . . that the original note actually has to be physically brought to a closing table?

A: No.

In light of these UCC provisions and the parties' evidence of Colorado real estate practices and customs, payoff would have been effective as against Bank if Dakota was an authorized agent to receive the payoff. We turn, then, to Bank's assertion that the trial court misapplied the law of agency when it determined Dakota was authorized to accept payoff of the Note.

## IV. Existence of Agency Relationship

Bank contends the trial court erred in finding that Dakota was Bank's agent. We disagree.

### A. Standard of Review as to Existence of Agency Relationship

■ The existence of an agency relationship is ordinarily a question of fact, *Gorsich*, 893 P.2d at 1361, and thus a trial court's finding of an agency relationship may not be set aside unless clearly erroneous, *see* C.R.C.P. 52.

### B. Dakota Was Bank's Agent

■ The trial court found that Dakota was acting as an agent for Bank in connection with the Note. Because this finding is supported by the record, we uphold it.

■ "An agent is generally one who acts for, or in place of, another, or is entrusted with the business of another." *Gorsich*, 893 P.2d at 1361.

[T]he existence of an agency relationship turns on the intention of the parties and is evidenced by their acts, not on what the relationship is called. What is critical is that the parties materially agree to enter into a particular relation to which the legal consequences of agency attach even though those consequences might not have been contemplated by the parties at the time of their agreement.

*Id.*

#### 1. Dakota's Status as Both Bank's Borrower and its Agent

Bank, noting that Dakota was its borrower, and had pledged the Note as security for that loan, maintains that Dakota could not simultaneously be Bank's borrower and its agent. Bank points out that under the terms of Dakota's loan from Bank, Dakota was permitted to retain payments made on the Note and on other notes pledged to Bank as part of Dakota's line of credit transaction. Thus, according to Bank, Dakota was merely servicing the Note for Dakota's own benefit and was not Bank's agent.

We are not persuaded that the debtor-creditor relationship between Dakota and Bank precluded the former from being the latter's agent with respect to the underlying loans. On the contrary, such a dual status of debtor-agent is not unique in Colorado, and dates back at least as far as the 1930s. *See Colorado Nat'l Bank v. Rehbein*, 88 Colo. 547, 548–49, 298 P. 952, 952 (1931).

#### 2. Actions Manifesting Agency

While Dakota was permitted to retain for itself periodic payments made by RE Services and the makers of other notes held by Bank, the record belies Bank's contention that Dakota was not acting for Bank with respect to this Note. The evidence at trial established that numerous tasks undertaken by Dakota in connection with this and other

notes were for Bank's benefit as holder of the notes, and this evidence supports the trial court's conclusion that Dakota was acting as Bank's agent with respect to the Note.

Bank allowed Dakota to act as loan servicer with respect to the Note and other notes it had pledged to Bank as collateral. In that role, Dakota provided monthly accounting reports on the status of this and other notes which Bank held as collateral. A Bank officer testified that Dakota had authority to enforce the Note "for payments." Testimony of this officer and another Bank officer established that, with Bank's knowledge, Dakota assigned loan numbers to the underlying loans; received monthly payments from the underlying borrowers, including all payments of principal, interest, taxes, and insurance; maintained escrows; issued payoff statements; and issued copies of IRS form 1098 to borrowers showing the amount of mortgage interest they had paid on their loans. Bank officers acknowledged that Dakota was authorized to declare default of an underlying note and to institute foreclosure proceedings "for [Bank's] benefit."

Bank had no way of knowing the balance due on this and other notes without obtaining that information from Dakota. It is apparent from the record, and Bank's counsel conceded at oral argument, that monthly principal payments made by borrowers to Dakota would have been applied to reduce the balance due on the underlying notes. Both Bank officers testified that they knew Dakota had received payoffs of underlying notes.

These facts contradict Bank's assertion that Dakota was not acting as Bank's agent, but was acting only for Dakota's own interest. If Bank's contention were true, then any payments made by RE Services to Dakota would not have affected the balance due on the Note held by Bank, and Dakota would not have been able to declare default of, or institute foreclosure proceedings with respect to, this or any other note held by Bank as collateral for its loan to Dakota. Additionally, as Bank's counsel conceded at oral argument, Dakota's handling of escrow payments for real estate taxes and real property insurance inured to the benefit of the Note's

holder—Bank—by protecting Bank's security interest in the property.

Moreover, Bank's admission that it could have hired a servicer other than Dakota to service the RE Services and other loans bolsters the conclusion that Dakota was servicing the loans for Bank's benefit. To conclude otherwise would mean that Bank was free to hire a third party to service the loans purely for *Dakota's* benefit. Such a conclusion would ignore economic realities and defy common sense.

This evidence establishes that Dakota was acting for Bank, and was entrusted with Bank's business, in connection with the Note, and thus was Bank's agent. *See Gorsich*, 893 P.2d at 1361. Because the trial court's finding that Dakota was Bank's agent is supported by the record, we will not disturb it.

## V.   Scope of Agency

Bank next contends the trial court erred in finding that Dakota was authorized to accept payoff of the Note. We disagree.

### A.   Legal Standards Regarding Scope of Agent's Authority

A principal may be bound by an agent's actions if the agent acts pursuant to either actual or apparent authority, regardless of whether the principal has knowledge of the agent's conduct. *Willey v. Mayer*, 876 P.2d 1260, 1264 (Colo.1994). Actual authority is that authority which is in fact given to an agent. *Life Investors Ins. Co. v. Smith*, 833 P.2d 864, 868 (Colo.App.1992); *see also Aquaduct, L.L.C. v. McElhenie*, 116 S.W.3d 438, 442 (Tex.App.2003) ("Actual authority denotes that authority which the principal ... by want of ordinary care allows the agent to believe himself to possess.").

Actual authority incorporates the concepts of express and implied authority. *Willey*, 876 P.2d at 1264.

Express authority exists whenever the principal directly states that its agent has the authority to perform a particular act on the principal's behalf. *See id.* Implied authority is actual authority circumstantially proved. *Vick v. Zumwalt*, 130 Colo. 148, 156,

273 P.2d 1010, 1014 (1954); *Moore v. Switzer,* 78 Colo. 63, 65, 239 P. 874, 875 (1925) ("Implied authority of an agent is actual authority evidenced by conduct, that is, the conduct of the principal has been such as to justify the . . . finding that the agent had actual authority to do what he did.").

██ Implied authority can be proved "by evidence of [the principal's] acquiescence with knowledge of the agent's acts, and such knowledge and acquiescence may be shown by evidence of the agent's course of dealing." *Cooley v. Eskridge,* 125 Colo. 102, 110, 241 P.2d 851, 855 (1952).

██ Whether an agent has been given authority to act on behalf of a principal is an issue of fact. *Rush Creek Solutions, Inc. v. Ute Mountain Ute Tribe,* 107 P.3d 402, 406 (Colo.App.2004). The scope of an agent's authority may be proved by circumstantial evidence. *McCreery v. Morrison,* 46 Colo. 533, 535, 105 P. 876, 877–78 (1909).

### B. Dakota's Authority to Accept Payoff of the Note

██ The trial court found that Dakota was authorized to accept a payoff based on the following facts. After Dakota assigned its rights and interest in the Note to Bank, Bank failed to notify the Note's maker that it was now the holder. Bank allowed Dakota to continue servicing this and other loans held as collateral by Bank, and to conduct those servicing obligations previously discussed.

The trial court noted testimony by Armijo's expert that it was common knowledge in the mortgage industry that Jaguar Mortgage Company and its related entities (which included Dakota) were permitted to accept final payoffs. The court also relied on testimony of a Bank officer that the Bank knew Dakota had previously accepted a payoff of another loan that had been pledged to Bank as collateral, and that Dakota had sent the proceeds of that payoff to Bank. The court further relied on the Bank officer's testimony that, when there was such a payoff, Bank "was just happy to get paid." When this officer was asked if he knew that Dakota was accepting loan payoffs without Bank's having

to bring the affected note "to the closing table," he testified, "[Bank] didn't know whether [such conduct] was happening or not happening. If it was good funds, [Bank] accepted funds to pay off the loan."

Because these findings are supported by the record, we will not disturb them. Although the trial court ruled that these facts established Dakota's apparent authority to accept payoff of the RE Services Note, the court also relied on case law discussing implied authority. We conclude these facts established Dakota's implied authority to accept a payoff, and on that basis, we uphold the trial court's ruling. *See Cole v. Hotz,* 758 P.2d 679, 682 (Colo.App.1987) (appellate court may affirm ruling on grounds other than those relied on by trial court).

Colorado Supreme Court precedents dating from the 1930s support the trial court's findings.

In *Stock Yards National Bank v. Neugebauer,* 97 Colo. 246, 248–49, 48 P.2d 813, 814 (1935), the original note payee had assigned the note to a bank. "[T]he bank permitted the payee to collect the principal in more than one installment, and credited the maker with purported payments without giving the maker the slightest inkling that any of the renewals or payments was not received with the authority of the holder." *Id.* at 249, 48 P.2d at 814. The supreme court held that "[t]he law will not permit a maker to be subjected to double payment under the circumstances thus shown." *Id.*

In *Colorado National Bank v. Rehbein,* Siener was the named payee on a promissory note. He continued to accept periodic payments on the note from the borrowers even after he—without the borrowers' knowledge—had assigned the note to a bank as security for a loan the bank extended to him. 88 Colo. at 548, 298 P. at 952. The supreme court held that the bank's acquiescence in Siener's collection of principal and interest, coupled with the bank's failure to provide notice to the maker that the bank was the holder of the note, vested Siener with implied authority to collect the payoff of the note. *Id.* at 552–53, 298 P. at 954. The court reasoned:

It is true ... the bank was under no duty to notify the maker of said note that it held [the note] as collateral security but its subsequent conduct created a duty to speak. Because of its failure to act after permitting Siener to hold himself out as the ostensible owner and holder of said note, to collect interest and indorse thereon an extension of the maturity thereof without investing his authority to make the same, the [borrowers] were led into a false position—to believe that Siener was the owner of said instrument and to pay the same.

*Id.* at 553, 298 P. at 954. Simply " '[a] word' from the bank to [the borrowers] 'would doubtless have prevented the [bank's] loss.' " *Id.* at 554, 298 P. at 954 (quoting *Gioso v. Di Bell,* 88 Colo. 287, 289, 295 P. 919, 919 (1931)). Accordingly, the court held that "[p]ayment to Siener, because of his ostensible ownership [of the note], coupled with his undisclosed agency to collect principal and interest of said note, operates as a complete defense against bank's claim" to foreclose. 88 Colo. at 552–53, 298 P. at 954.

Here, the record supports the trial court's finding that Bank did not provide notice to RE Services or Armijo that Dakota had assigned the Note to Bank. A Bank officer acknowledged that Bank never notified RE Services that Bank wanted any payments to be made to Bank. The Stewart Title employee who was responsible for the Armijo closing testified that she was unaware of any relationship between Dakota and Bank. The court found, with record support, that even if Stewart Title had conducted a title search, it would not have discovered evidence of Bank's ownership of the Note in the title records, because Bank had failed to secure clear title to the Note and to record it before the Armijo closing.

Moreover, referring to Bank's having learned, before the Armijo closing, that Dakota was engaged in questionable practices, the trial court, citing *Skott v. Bank of America Illinois,* 266 Ga. 532, 468 S.E.2d 359, 361 (1996), found as follows:

In the April–May 2008 time period [two Bank officers] were questioning the Dakota loans and their reliability. Even after Bank became aware of problems with Dakota there is no evidence that [Bank] engaged in any prophylactic measures to protect itself or others from Dakota's questionable practices. The loss should fall upon [Bank, which,] by [its] conduct, created the circumstances which enabled [Dakota] to perpetrate the wrong and cause the loss.

Importantly, the record supports the trial court's finding that Bank knew Dakota had, on at least one prior occasion, collected a payoff of a note held by Bank. At trial, a Bank officer testified to this fact. He also acknowledged he was aware that "large chunks of money" had been deposited in Dakota's account with Bank, and that those deposits represented payoffs of underlying notes. When asked whether he did anything to stop this practice, the officer replied, "Why would I stop it?"

We agree that under the circumstances presented here, Dakota had implied authority to accept payoff of the Note, and that Armijo cannot be prejudiced by Dakota's failure to tender the payoff to Bank.

Courts in other jurisdictions presented with similar facts have reached similar conclusions. *See Equity Bank v. Gonsalves,* 44 Conn.Supp. 464, 691 A.2d 1143, 1145 (1996) ("The general rule is that notice to the debtor of an assignment is necessary in order to charge the debtor with duty of payment to an assignee and that if before receiving notice of the assignment, the debtor pays the debt to the assignor, he is discharged of the debt.") (citing 6 Am.Jur.2d 278, *Assignments* § 96 (1963)); *Skott,* 468 S.E.2d at 360–61 ("[W]here a principal has 'placed an agent in such a situation that a person of ordinary prudence conversant with business usages and the nature of that particular business is justified in assuming that such agent has authority to perform a particular act and deals with the agent upon that assumption, [a principal] will not be permitted to prove that the agent's authority was, in fact, less extensive ....' ") (quoting *Commercial Credit Corp. v. Noles,* 85 Ga.App. 392, 69 S.E.2d 309, 311 (1952)); *United Missouri Bank v. Beard,* 877 S.W.2d 237, 242 (Mo.Ct.App.1994) ("When a note contains a prepayment privi-

lege, an agent's authority to make collections on the note for his principal includes not only the authority 'to receive payments of the note when same was matured,' but also the implied authority 'to receive payments which the payors, under the terms of the instrument, had the right to make before the note matured.'") (quoting *Hicks v. Hugo*, 68 S.W.2d 160, 162 (Tex. Comm'n App.1934)).

Here, as in *United Missouri Bank v. Beard,* the Note permitted prepayment of principal. By allowing Dakota to collect payments of principal, including *pre* payments of principal, Bank necessarily allowed its collateral interest in the Note to be impaired to the extent the face amount of the Note was incrementally reduced by the borrower's payments. We see no significant distinction between allowing prepayments of principal to be made to Dakota and allowing it to accept total payoffs of the indebtedness at any time. *See United Missouri Bank v. Beard,* 877 S.W.2d at 242 (prepayment provision that allowed for prepayment at any time without note holder's consent, coupled with the loan servicer's authority to collect the monthly principal and interest payments, gave servicing agent implied authority to collect total payoff).

We are not persuaded to the contrary by Bank's assertion that it restricted Dakota's authority to accept payoffs by the following language contained in the Commercial Security Agreement executed by Bank and Dakota:

> Until default, Grantor (Dakota) may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender ( [Bank]) is required by law to perfect Lender's security interest in such Collateral.

The trial court found that this clause did not state or imply that only Bank could accept a payoff at a closing. We agree. At most, this language allowed Bank to retain the Note in its custody (which it did), and allowed Dakota to receive and retain payments made by the borrower to an extent "not inconsistent" with the security agreement. Certainly, Dakota was required to turn over Stewart Title's payoff of the Note to Bank; but that does not mean that Dakota was unauthorized to accept the payoff on Bank's behalf in the first instance.

Bank further argues that its practice was to refrain from releasing a note and deed of trust underlying its loan to Dakota until Dakota had transmitted the payoff funds for that note to Bank. This argument is unavailing, as it does nothing to demonstrate that Dakota was unauthorized to accept the payoff funds at closing on Bank's behalf. Expert testimony established that notes are typically released after closing.

Because the record supports the trial court's finding that Dakota was authorized to accept the payoff, we conclude the court correctly ruled that Bank could not enforce the Note against Armijo, and that Bank was not entitled to foreclose on Armijo's property.

Order affirmed.

Judge LOEB and Judge RICHMAN concur.