24CA1276 Estate of Willis 08-07-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1276
Jefferson County District Court No. 12PR30637
Honorable Todd L. Vriesman, Judge

---

In re the Estate of Marilyn Kay Willis, deceased.

Todd Willis,

Appellant,

v.

Sabrina Willis,

Appellee.

---

ORDER AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE GROVE
Welling and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 7, 2025

---

Conover Law LLC, Tammy D. Conover, Scott H. Challinor, Greenwood Village, Colorado, for Appellant

Larry D. Harvey PC, Larry D. Harvey, Denver, Colorado, for Appellee

¶ 1    Todd Willis (Todd)[1] appeals the trial court's order denying his petition for final settlement of the estate of Marilyn Kay Willis (Kay) and ruling that the estate inventory should include Kay's ownership interests in two pieces of real property.  We affirm in part and reverse in part and remand the case to the trial court for it to conduct further proceedings consistent with this opinion.

## I.    Background

¶ 2    This appeal concerns the disposition of two properties once owned by Kay and her husband, Ken Willis (Ken).  The first is located on 30th Avenue in Golden (the Golden property).  The second is a duplex on Allison Street in Wheat Ridge (the Allison property).

¶ 3    Ken and Kay moved into the Golden property in the 1970s with their two children, Sabrina Willis (Sabrina) and Todd.  In 2009, they purchased the Allison property for use as a rental.  Todd helped manage this property over the years.  Eventually, Todd

---

[1] Because the parties and their deceased parents all share the same surname, we refer to them by their given names throughout this opinion for clarity.  We mean no disrespect by doing so.

married and settled in Arvada. Sabrina also lived in the area with her two children.

¶ 4 As Ken and Kay grew older, they began having health issues. Todd assisted his parents and often stayed overnight as their health declined. Later, he experienced his own health issue and took a leave of absence from work, lived at the Golden property full time in 2017, and further expanded his role as his parents' caretaker. Sabrina also assisted, but not as much as Todd. In 2019, Ken moved into a nursing home and died the same year. Kay passed in 2020.

¶ 5 The events underlying this appeal mostly occurred between 2015 and 2020. During this five-year period, as Ken's and Kay's health began declining, they substantially revised their estate plan through two lawyers, Trace Tyler and Kathryn Kaeble.

¶ 6 In 2015, after a planning meeting, Tyler drew up estate planning documents that created the Marilyn Kay Willis Revocable Living Trust (Trust) as well as "medical" and "general durable" powers of attorney that authorized Kay to act as Ken's agent. The planning documents, which were executed in 2016, provided that the parents' assets would be divided equally between their two

children. It is undisputed that Ken was incapacitated the next year and made no decisions regarding the estate after the 2016 will.

¶ 7 In 2017, Todd became the signer on his parents' bank accounts and paid their bills. After Kay suffered a serious fall the same year, either she or Todd also prepared a document, which we will refer to as "the revocation," that stated as follows:

> To Whom It May Concern: I, Marilyn Kay Willis, hereby revoke my status as Agent (Power of Attorney) signed January 11, 2016, for Kenneth E. Willis Power of Attorney. The new agent per the Power of Attorney will be Todd Lamar Willis effective July 13, 2017.

The revocation was signed and notarized in July 2017.

¶ 8 In December 2017, attorney Tyler received an email from Kay's email account that requested substantial revisions to the estate plan.[2] The email said that the "new will has been instituted because of a change in Sabrinas [sic] lack of care or concern in caring for her parents in their time of need." The requested changes included the following, all of which were to "go into affect [sic] immediately upon the sending of this email."

---

[2] Sabrina questioned the source of this email at trial, and the court, too, "reasonably doubt[ed] it was written by [Kay]."

- Todd would be the "sole executor of [the parents'] estates and has full medical [power of attorney] and all other [powers of attorney] needed for [the parents'] care and the settlement of [the] estate."

- If the new will "is Contested the person that contests it will receive nothing."

- Some specific personal property was to go to Todd, with the remainder being split 50/50.

- "All cash and investments will be split 75/25 with 75% going to Todd and 25% to Sabrina."

- The Golden property and Allison property were both to be deeded to Todd — apparently via an inter vivos transfer.

¶ 9    Tyler met with Kay and Ken sometime in February 2018, and Tyler subsequently drew up and delivered an amendment to the Trust and drafted new wills for the couple reflecting the requested changes.  He also drafted a quitclaim deed that purported to transfer the couple's jointly held Golden property to Todd upon execution.  He left these documents with Ken and Kay for execution.  In late February, Kay signed them — on her own behalf

4

and, even though she had signed the revocation the year before, for Ken as well — and had them notarized.

¶ 10     In May 2018, Kay met with attorney Kaeble to discuss Medicaid asset protection.  Kaeble advised Kay that the current Trust would not "legally hid[e] assets" in order to qualify for Medicaid.

¶ 11     At the meeting, Kay showed Kaeble the estate planning documents that had been prepared by Tyler.  Among them was the executed quitclaim deed for the Golden property.  Kay told Kaeble that the Allison property was owned by Willis Properties, LLC, and that Sabrina owned a ten percent stake in the LLC.  But Kay also said that she wanted to transfer the property in its entirety to Todd.  Kaeble explained that Sabrina would need to be bought out to do this, and she then prepared an assignment that Sabrina could sign in exchange for money.  Kaeble believed that the family members would discuss the matter with Sabrina and get back to her.  As a result, Kaeble drafted a revised will that did not reference the two properties.  Kay executed the revised will on May 24, 2018.  At the same time, Kay executed a general durable power of attorney that named Todd as her agent.

¶ 12    When Ken died in 2019, Kaeble was again contacted to see if any portion of Ken's will needed to be probated. At that point, Kaeble realized that the Allison property had been "jointly owned by Ken and Kay," and not by the LLC. Kaeble then drafted a quitclaim deed that purportedly transferred Kay's interest in the Allison property to Todd, who signed the deed as Kay's agent in June 2020.

¶ 13    After Kay died September 2020, Sabrina petitioned to formally probate her estate. Todd was appointed personal representative. He filed an estate inventory that did not include either the Golden property or the Allison property; later, he filed a petition for final settlement that valued the estate at $95,720.84. Sabrina objected to the valuation, arguing, among other things, that the Golden property and Allison property should have been included in the estate inventory because the quitclaim deeds were invalid. After a three-day bench trial, the court ruled as follows:

- The quitclaim deed for the Allison property did not transfer ownership to Todd because the Trust never owned the Allison property even though it was listed as the sole grantor. Because the deed did not transfer

anything, Kay's interest in the property remained an asset of the estate.

- The quitclaim deed for the Golden property did transfer Kay's interest but, due to the revocation, she was no longer Ken's agent at the time that she signed the quitclaim deed on his behalf. The deed therefore did not transfer Ken's interest to Todd. Instead, the quitclaim deed severed the joint tenancy, and Kay inherited Ken's half of the property when he died. That one-half interest still belonged to Kay at the time of her death, and it was also an estate asset.

- Reformation of the deeds, which Todd sought in an effort to change the grantors of both properties (and thereby make the transfers effective so that he wholly owned the properties), was not warranted. The court found that the evidence presented at the hearing did not establish that there was a "'clear and unequivocal' global estate plan by [Kay] that requires document reformation."

¶ 14    Todd now appeals, contending that the trial court misinterpreted the Allison property deed, the Golden property deed,

7

and related documents. In the alternative, Todd argues, if the court correctly interpreted the deeds, then its decision not to reform them or the will amounted to an abuse of discretion.

## II.   Deed Interpretation

¶ 15   Todd first contends that the trial court erroneously interpreted the two quitclaim deeds and related documents. We disagree.

### A.   Applicable Law and Standard of Review

¶ 16   "When a court enters a judgment following a bench trial, that judgment presents a mixed question of law and fact." *State Farm Mut. Auto. Ins. Co. v. Johnson*, 2017 CO 68, ¶ 12. We review the interpretation of statutes, deeds, and recorded instruments de novo. *Premier Bank v. Bd. of Cnty. Comm'rs*, 214 P.3d 574, 577 (Colo. App. 2009); *Kroesen v. Shenandoah Homeowners Ass'n*, 2020 COA 31, ¶ 31.

¶ 17   We review findings of fact for clear error, upholding the findings if there is any evidence in the record supporting them. *Est. of Breeden v. Gelfond*, 87 P.3d 167, 172 (Colo. App. 2003); C.R.C.P. 52. And as trier of fact, the trial court determines the sufficiency, probative effect, credibility, and weight of the evidence. *Breeden*, 87 P.3d at 172. "When the evidence is conflicting, a

reviewing court may not substitute its conclusions for those of the trial court merely because there may be credible evidence supporting a different result." *Id.*

¶ 18    Deeds are usually construed in accordance with the general rules of construction of written instruments. *Terry v. Salazar*, 892 P.2d 391, 393 (Colo. App. 1994), *aff'd*, 911 P.2d 1086 (Colo. 1996). In accordance with those rules, if a deed is unambiguous, it must be enforced as written. *Owens v. Tergeson*, 2015 COA 164, ¶ 15.

¶ 19    "[T]he fact that the parties have different opinions about the interpretation of the deed does not of itself create an ambiguity." *Hudgeons v. Tenneco Oil Co.*, 796 P.2d 21, 22 (Colo. App. 1990). "In ascertaining whether certain provisions of an instrument are ambiguous, we must examine the instrument's language and construe it in harmony with the plain and generally accepted meaning of the words employed. Terms are ambiguous when they are susceptible of more than one reasonable interpretation." *Allen v. Reed*, 155 P.3d 443, 445 (Colo. App. 2006). Only when terms are ambiguous will we resort to extrinsic evidence to determine parties' intent. *Kendall v. Wiles*, 483 P.2d 388, 389 (Colo. App. 1971).

## B. Allison Property

¶ 20   The Allison property's quitclaim deed, notarized on June 10, 2020, begins by naming the grantor and grantee.

> THIS DEED is dated June 10, 2020 and is made between Marilyn Kay Willis Revocable Living Trust, dated January 11, 2016, and Todd Lamar Willis as agent for Marilyn Kay Willis under State of Colorado Statutory Form Power of Attorney of Marilyn Kay Willis, dated May 24, 2018 (whether one, or more than one), the "Grantor," and Todd Lamar Willis, whose legal address is [the Golden property] (whether one, or more than one), the "Grantee."

¶ 21   A description of the nature of the transfer and the real estate parcel follows; the deed is signed by Todd over a signature block that reads:

> Todd Lamar Willis, as agent for Marilyn Kay Willis under State of Colorado Statutory Form Power of Attorney of Marilyn Kay Willis dated May 24, 2018.

¶ 22   Todd argued in the trial court that, when he signed the deed as "agent for Marilyn Kay Willis," he was doing so on her behalf in two capacities — as Kay's *personal* agent and also in her capacity as *trustee* of the Trust.  The court rejected this argument because the Allison property deed identified the Trust alone as the grantor. As a result, it ruled, when Todd signed on Kay's behalf, he was only

doing so as her agent in her capacity as trustee. And because the Trust did not own the Allison property, the quitclaim deed was ineffective and Kay's interest remained part of the estate. *See Tuttle v. Burrows*, 852 P.2d 1314, 1316 (Colo. App. 1992) ("[A] quitclaim deed [i]s ineffective to transfer a title not vested in the [transferor] at the time of its execution.").

¶ 23    On appeal, Todd argues that the court's interpretation was wrong, and that the Allison property deed in fact "convey[ed] title from *both* the Trust *and* Kay, individually as grantors, to Todd as grantee." As support for his position, he points out that the deed refers to both the Trust and Kay individually, and emphasizes the parenthetical phrase "whether one, or more than one" that follows the deed's identification of the Trust and Todd as the parties to the deed, arguing that it indicates that there is more than one grantor. He also observes that the signature block generally referred to Todd as Kay's agent without limiting the agency relationship to her capacity as trustee.

¶ 24    Like the trial court, however, we conclude that the Allison property's quitclaim deed unambiguously identified the Trust, and only the Trust, as the grantor, and we are not persuaded that the

phrase "whether one, or more than one" somehow expanded the pool of potential grantors beyond the Trust itself. To the contrary, the obvious purpose of that parenthetical language — which the deed repeats after identifying Todd as the sole grantee — is to ensure grammatical clarity. Specifically, the language in question ensures that, regardless of whether there is one grantor or many, or one grantee or many, both parties to the transaction will be referred to in the singular throughout the document. We are aware of no authority — and Todd cites none — suggesting that language of this type is intended to expand, or has the effect of expanding, the potential pool of grantors beyond those specifically identified in the deed as the owner of the property being transferred.

¶ 25    This interpretation also finds support in the fact that the deed includes only one signature block, which the court found that Todd signed for Kay in her role as trustee. That finding makes sense; indeed, the number of signatures on the deed should logically match the number of grantors. *See Hudgeons*, 796 P.2d at 22 ("We will not torture words and phrases to create an ambiguity where the ordinary meaning of the words leaves no room for ambiguity."); *Bolser v. Bd. of Comm'rs*, 100 P.3d 51, 53 (Colo. App. 2004) ("We

must not ascertain intent from 'portions presented in isolated sentences and clauses,' but from the deed as a whole.") (citation omitted).

¶ 26 Because we conclude that the trial court correctly interpreted the plain language of the deed, we need not address any extrinsic evidence of the parties' intent, nor do we reach Sabrina's alternative argument that the transfer was ineffective because Kay's general durable power of attorney did not authorize Todd to transfer Kay's property to himself as a gift.

## C. Golden Property

¶ 27 On February 22, 2018, Ken and Kay ostensibly transferred the Golden property to Todd via quitclaim deed. Kay signed the deed on her own behalf and as "POA for Kenneth E. Willis."

¶ 28 Had Ken's general durable power of attorney still been in force at the time that Kay signed the quitclaim deed, her signature on Ken's behalf would have been sufficient to allow the transfer. On July 12, 2017, however, Kay signed the revocation. Based on the revocation, the trial court found that the quitclaim deed was only partially effective — i.e., it transferred only Kay's half of the Golden property to Todd — because, due to the revocation, she no longer

had a valid general durable power of attorney that authorized her to act on Ken's behalf.

¶ 29     Specifically, after reviewing the two powers of attorney, the plain language of the revocation, and the evidence presented at the hearing, the trial court found that, when she signed the revocation, Kay relinquished both the medical power of attorney *and* the general durable power of attorney, and appointed Todd to act as Ken's agent going forward. As a result, Kay no longer had authority to act on Ken's behalf at the time that she signed the Golden property deed "for" him. Instead, by executing the quitclaim deed, Kay severed the joint tenancy and transferred her one-half interest to Todd. Todd then became a cotenant with Ken; upon his death in 2019, Ken's interest passed Kay, who retained ownership of that one-half interest until her death, when it became part of her estate.

¶ 30     Todd disagrees with the court's interpretation of the revocation, arguing that it only applied to Ken's medical power of attorney, and that Kay never relinquished her authority to act under the general durable power of attorney. We are not persuaded. As the trial court pointed out, the plain language of the revocation — that Kay "revoke[s] [her] status as Agent (Power of

14

Attorney) signed January 11, 2016, for Kenneth E. Willis Power of Attorney" — gave "no indication whatsoever that the revocation was not applicable to the financial power of attorney." And to the extent that the plain language was ambiguous, the court found that the evidence presented at the hearing supported an inference that the revocation applied to both the medical and general durable powers of attorney. For example, Todd began taking Ken to medical appointments once the revocation occurred, but the court also inferred that the revocation "facilitated [Todd's] addition" to his parents' financial accounts shortly after the revocation was signed. While it is true that Todd and attorney Kaeble testified that Kay only intended to revoke the medical power of attorney, the court declined to credit these claims, and we must defer to that assessment of the evidence. *See In re Estate of Romero*, 126 P.3d 228, 231 (Colo. App. 2005) ("Evaluation of the credibility of witnesses . . . is a matter solely within the fact finding province of the trial court, and we will not reweigh testimony . . . on appeal.").

¶ 31    Accordingly, because it is supported by the plain language of the revocation and factual findings made after an evidentiary hearing, we agree with the trial court's conclusion that, due to the

15

revocation, the quitclaim deed for the Golden property severed the joint tenancy rather than transferring the entire property to Todd.

## III.     Reformation

¶ 32    Finally, Todd contends that the trial court abused its discretion when it refused to reform both the quitclaim deeds and/or Kay's will to reflect Kay's intent to pass the Allison property and the Golden property to Todd.  While we affirm the court's decision to not reform the quitclaim deeds, we conclude that its refusal to consider Todd's argument for reformation of Kay's will was error.  Therefore, we reverse and remand for the trial court to rule on Todd's request for reformation of the will.

### A.     Standard of Review and Applicable Law

¶ 33    Section 15-11-806, C.R.S. 2024, grants a court discretionary authority to reform the terms of a governing instrument to conform the terms to the transferor's intent, if this intent "is proved by clear and convincing evidence" and the terms were "affected by a mistake of fact or law."  A "governing instrument" is defined to include a deed or will.  *Id.*; § 15-10-201(22), C.R.S. 2024.  "Will" includes "any codicil and any testamentary instrument that . . . revokes or revises another will."  § 15-10-201(59).

¶ 34　Reformation of an instrument is an equitable remedy. *Bd. of Comm'rs v. Timroth*, 87 P.3d 102, 105 (Colo. 2004). The power to fashion equitable remedies such as reformation lies within the discretion of the trial court, and we will not disturb the court's rulings on review absent an abuse of discretion. *Beren v. Beren*, 2015 CO 29, ¶ 12.

## B.　Preservation

¶ 35　Sabrina contends that Todd's appellate arguments regarding reformation are unpreserved. We disagree. Before trial, Todd filed a brief addressing the standards for "reformation of a governing instrument" under section 15-11-806, and while it does not appear that the issue was discussed at the hearing, his proposed findings of fact and conclusions of law outlined in detail the grounds on which reformation of the will should be granted. The court explicitly declined to address that question because, it found, Kay's will was "not proposed to be altered and is, in fact, stipulated." Instead, the court considered whether the quitclaim deeds should be reformed, concluding that the evidence presented at trial did not present a clear enough picture of Kay's intent to support such a step.

¶ 36　It is axiomatic that in civil cases, issues not raised in or decided by the trial court generally will not be addressed for the first time on appeal. *Brown v. Am. Standard Ins. Co.*, 2019 COA 11, ¶ 23. No talismanic language is necessary, however; as long as the party presented the trial court with the "sum and substance" of the argument it makes on appeal, and the trial court ruled on it. *Berra v. Springer & Steinberg, P.C.*, 251 P.3d 567, 570 (Colo. App. 2010).

¶ 37　Here, the trial court's order addressed reformation of the deeds, so that issue is obviously preserved. *See Brown*, ¶ 23 (concluding that because the trial court had ruled on the issue raised in the appellate court, the issue was preserved for appeal); *Battle N., LLC v. Sensible Hous. Co.*, 2015 COA 83, ¶ 13 (concluding that an issue was properly preserved for appeal when, despite ambiguity in the request to the trial court, the trial court had ruled on the issue). But the court declined to address Todd's request for reformation of the will because, it found, the will was "stipulated" and "not proposed to be altered." We cannot square this finding with the record. Even if the parties stipulated to the admission of the will, nothing in the record suggests that Todd agreed that its admission would preclude his request for reformation. Indeed,

Todd's proposed findings of fact and conclusions of law suggest just the opposite. He devoted several lengthy paragraphs of that filing to reformation of the will, and even suggested specific language for the court to insert into the will should it decide reformation was appropriate.

¶ 38    Under these circumstances, we conclude that both of Todd's reformation arguments were preserved.

## C.    Analysis

### 1.    Reformation of the Will

¶ 39    As noted above, even though the issue was preserved, the trial court did not address Todd's request for reformation of the will. Because reformation requires a discretionary exercise of a court's equitable powers, we are not in a position to address the issue for the first time on appeal. *See McCallum Fam. L.L.C. v. Winger*, 221 P.3d 69, 79 (Colo. App. 2009) (holding that a decision whether to exercise equitable discretion "must be determined in the first instance by the trial court," and remanding the case for the trial court to make equitable ruling). We therefore remand the case so that the trial court may rule on Todd's request for reformation of

the will based on the existing record.  Either party may appeal that ruling once it has been entered.

2.	Reformation of the Deeds

¶ 40	Turning to deed reformation, as we understand it, the trial court declined Todd's request because there was not clear and convincing evidence showing the parents' intent to give him the Allison and Golden properties.  We agree with that conclusion.

¶ 41	Through section 15-11-806, the Colorado Probate Code "provides an appropriate vehicle by which disappointed beneficiaries can seek to effectuate what they believe to be a testator's true intent, namely, a reformation action." *Baker v. Wood, Ris & Hames, Pro. Corp.*, 2016 CO 5, ¶ 54.  Reformation is "an appropriate remedy when the evidence clearly and unequivocally shows that an instrument does not express the true intent or agreement of the parties." *Poly Trucking, Inc. v. Concentra Health Servs., Inc.*, 93 P.3d 561, 563 (Colo. App. 2004).

¶ 42	After considering the evidence presented at the bench trial, the court found that the evidence did not clearly and convincingly establish that Kay and Ken intended to transfer the Allison property and Golden property to Todd.  Because their intent was a question

of fact, *see Bolinger v. Neal*, 259 P.3d 1259, 1263 (Colo. App. 2010), the trial court's findings with respect thereto are determinative in the absence of clear error. *See* C.R.C.P. 52 ("Findings of fact shall not be set aside unless clearly erroneous . . . ."); *accord Woodbridge Condo. Ass'n v. Lo Viento Blanco, LLC*, 2020 COA 34, ¶ 24, *aff'd*, 2021 CO 56. "A factual finding is clearly erroneous if nothing in the record supports it." *Whiting-Turner Contracting Co. v. Guarantee Co. of N. Am. USA*, 2019 COA 44, ¶ 36; *accord In re Estate of Little*, 2018 COA 169, ¶ 17 ("When the evidence is conflicting, a reviewing court may not substitute its conclusions for those of the trial court merely because there may be credible evidence supporting a different result." (quoting *Citywide Banks v. Armijo*, 313 P.3d 647, 649 (Colo. App. 2011))).

¶ 43    Consistent with the foregoing discussion, there is record support for the trial court's finding that Ken and Kay did not have a "clear and unequivocal" global estate plan that would provide guidance as to their true intent. As the court pointed out, the deeds in question were interrelated with, and largely a product of, a confusing, ad hoc series of events that included the creation of an unfunded trust, a "family LLC that appear[ed] to have no role," and

21

"a debate about power of attorney documents [and] the breadth of their delegated powers." In less than three years, Kay executed three wills "that changed equal distribution to children of all assets to an unequal distribution of minimal personal property."

¶ 44 Given these shifting circumstances, the court reasonably concluded that the evidence before it failed to clearly and unequivocally establish the necessary intent to transfer the Allison property or the Golden property entirely to Todd. While Todd points to testimony supporting his claims of intent, we may not reweigh the testimony on appeal. *See Romero*, 126 P.3d at 231. Because the court's ruling was supported by the evidence, we conclude that its refusal to reform the deeds was not an abuse of discretion.

## IV.   Disposition

¶ 45 We affirm the trial court's order in part and reverse it in part and remand the case with instructions to resolve Todd's request to reform Kay's will under section 15-11-806.

JUDGE WELLING and JUDGE JOHNSON concur.